J-S26016-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: C.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: C.L., MOTHER | No. 2080 MDA 2014 |

Appeal from the Order Entered on November 10, 2014
In the Court of Common Pleas of Schuylkill County
Civil Division at No.: CP-54-DP-0000296-2010

BEFORE: OTT, J., WECHT, J., and JENKINS, J.

MEMORANDUM BY WECHT, J.: **FILED APRIL 23, 2015**

C.L. ("Mother") appeals the November 10, 2014 order that was entered following a permanency review hearing. The order changed the goal for C.L. ("Child") (born in August 2008) from reunification to adoption with a concurrent goal of placement with a legal custodian. The order also placed Child with J.R. ("Aunt"), Child's maternal aunt, who lives in Utah. We affirm.

Child came to the attention of the Schuylkill County Children and Youth Services ("the Agency") in October 2009 when the Agency received reports concerning Mother's mental health, drug use, and parenting ability.[1] On November 17, 2010, the Agency received a report that Delaware County Children and Youth Services obtained emergency custody of Child following a

---

[1] Child's father's identity is unknown, although, at a 2013 hearing, Mother identified the father as "Habib from Syria" with whom she had not had contact since before Child's birth.

report that Mother was living in her car with Child. When Child was taken into custody, Mother became combative and was hospitalized.

On November 23, 2010, the Agency filed a dependency petition. On December 13, 2010, the Schuylkill County Court of Common Pleas entered a protective order that granted the Agency custody of Child and scheduled a dependency hearing. At the hearing on December 20, 2010, the court found that Child was dependent. The court placed Child in a foster home. Although Mother initially was uncooperative, she began to make progress in meeting her goals for reunification. In January 2011, Aunt, who was in Utah, contacted the Agency about being a resource for Child, but preferred to afford Mother the opportunity to regain custody.

On January 16, 2012, Child was returned to Mother's care after Mother had complied substantially with the permanency plan. Mother had been successfully discharged both from a partial hospitalization program for her mental health issues and from drug and alcohol treatment. However, Mother continued to receive services with the Agency, and Child remained dependent. On July 30, 2012, the court terminated the dependency.

On September 4, 2012, the Agency filed another dependency petition. The Agency alleged that, on August 29, 2012, it received a referral regarding Mother's mental health. The referral described Mother as delusional, paranoid, and rambling. The Agency required police intervention to get access to assess Child's safety. Mother was transported to the hospital but was released after an evaluation. The Agency obtained an emergency

custody authorization for Child. Mother suggested Aunt as a possible resource for Child, but Aunt suggested other relatives who lived closer to Mother. On September 10, 2012, the court again found Child to be dependent and ordered him to be placed with a foster family. Also in September 2012, Mother was arrested in Montgomery County.[2]

Aunt again contacted the Agency about being a resource for Child, but was ruled out due to the distance and concerns about the depth of her relationship with Child. However, the Agency initiated phone contact between Child and Aunt. Despite a lack of initial compliance, on August 12, 2013, Child was returned to Mother's care. The court found that Mother had made substantial progress at that time, although the Agency continued in-home supervision and the court noted that Child "is at imminent risk of removal from [his] home." Order, 8/12/2013, at 2. On February 10, 2014, the court terminated the dependency.

On July 31, 2014, the Agency filed the dependency petition from which this appeal stems. The Agency received reports concerning Mother's mental health and Child's safety. The Agency attempted to assess Child's safety, but Mother refused access. The police were called to assist. The Agency

---

[2] Mother was incarcerated from September 5 through November 9, 2012. She pled guilty to disorderly conduct and received a probationary sentence.

received emergency custody of Child. On August 4, 2014, the court found Child to be dependent and ordered placement with a foster family.

The trial court summarized the factual record of this dependency as follows:

> [O]n July 28, 2014, the Agency was again contacted with concerns regarding Mother's mental health, allegations of drug use, and an inappropriate person residing in the home, leading to further Agency involvement. As a result of those reports, police intervention was required and emergency custody of [Child] was granted by [the trial court] on July 29, 2014. Following the dependency finding of [the trial court] on August 4, 2014, [Mother] was hospitalized in the behavioral health unit at the Schuylkill Medical Center on August 6, 2014, as a result of intervention by the Shenandoah Police Department due to reports of Mother being disruptive in various businesses, walking in town naked, and being suicidal. Some of the conduct leading to that hospitalization is outlined in the Affidavit submitted as testimony and dated October 29, 2014.[3] [Mother] was discharged from the hospital on August 20, 2014, and diagnosed with Major Depressive Disorder, Post-Traumatic Distress Disorder, Polysubstance Abuse, and Personality Disorder. Discharge instructions included follow-up treatment as well as a prescription regimen. Following [Mother's] discharge from the hospital, the Agency caseworker reported that [Mother] continued to maintain verbally aggressive actions toward the Agency and Court staff, and continued to have racing and scattered thoughts. As noted by the caseworker in that Affidavit, [Mother] had no compliance with the permanency plan in that she simply refused to participate in Agency services, specifically to address her mental health and drug abuse history.
>
> *   *   *

---

[3] The trial court noted that, at many of the dependency and review hearings, "testimonial affidavits" were offered by the Agency caseworkers and were made part of the record.

The requirements of Mother to achieve reunification under the service plan were set forth by Caseworker [Marcia] Hoke at the hearing of November 10, 2014, as follows: "To submit to random drug screens; if recommended, participate in a drug and alcohol program; complete a psychological eval (sic); and intake at Service Access and Management for case management; engage in medication management; counseling; allow access to her home; and maintain appropriate contact with [Child]." Due to [Mother's] failure to adequately address any goals of the service plan, the Agency filed for a placement review hearing seeking to alter the placement plan and change the goal of the original plan from reunification to adoption, with a concurrent goal of placement with a legal custodian. That goal change was implemented by the Order of November 10, 2014.

[Child] has been in foster care for 28 months out of his 6 years of life.

\* \* \*

The testimony of [Ms. Hoke] at the review hearing of November 10, 2014, demonstrated that [Mother] had essentially refused to comply with any of the identified needs within the service plan. This was consistent with the prior testimonial affidavits where [Mother] would engage in service while [Child] was in placement, [Child] would be returned to [Mother]; however, primarily due to mental health issues, conditions for [Child] would deteriorate resulting in subsequent placement outside of the home. As noted by Ms. Hoke, ongoing efforts were made by the Agency to attempt to maintain [Child] in [Mother's] home, and yet non-compliance by [Mother] was the eventual result. As reflected by the caseworker[, Mother] would make some progress, but it would inevitably be short lived. Ms. Hoke testified as to the service plan developed to return [Child] to [Mother] . . . but there simply was no compliance with those goals. Under cross-examination by [Mother's] attorney as to the issue of drug use, it was instructive that one of the involvements in 2014 involved synthetic marijuana use with [Child] in the home, although [Mother] did not test positive for drugs. The only component of the service plan that Mother engaged in involved visitation of [Mother] with [Child]; however, that was problematic. Mother refused visits through one referral [agency] (Access Services) and when referred to another resource (Family Support Unit), visitation was cancelled due to Mother's cursing and being belligerent to staff. On one visit being supervised by

the Agency, Mother attempted to remove [Child] from the court-ordered custody of the Agency requiring police intervention.

The testimony of [Mother] confirmed [the trial court's] belief that she is not capable of providing a safe and nurturing environment for [Child. Mother] appeared agitated during questioning, disputed that any intervention for any service was required, and essentially engaged in an attack on any service provider that attempted to provide necessary services. When asked simple questions, such as her interaction with [Child] during periods of visitation, she would redirect the question and blame others, including foster parents, for any problems related to [Child]. Although she had been diagnosed, and both mental health treatment and medication [were] recommended, [Mother] insisted that she had already studied psychiatry and that she knew that these people were mistaken. Rather than focusing on needs she and [Child] might require to direct toward reunification, she merely rambled about unsubstantiated reports of [Child] in the foster home, and allegations against the Agency for not getting her other "son off drugs in Gilbertsville" and use of a "power wheel" against Agency workers. When questioned about her walking around town without clothing, she talked about having a little outfit on, and then moved into police violations of her Fourth Amendment right to retreat and suggested that the incident was the result of gossip, and because she would not sleep with the female neighbor who made the report. When questioned about her compliance with mental health treatment and following medication requirements, she simply dismissed them because her faith does not agree with psychiatry.

Trial Court Opinion ("T.C.O."), 1/12/2015, at 2-6 (citations to record omitted).

Aunt was licensed as a foster placement in Utah and had maintained telephone contact with Child. On November 10, 2014, the court changed Child's goal from reunification with Mother to adoption, with a concurrent goal of placement with a legal custodian. The court also ordered that Child be placed with Aunt in Utah.

On December 8, 2014, Mother filed a notice of appeal and a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On January 12, 2015, the trial court filed its opinion pursuant to Pa.R.A.P. 1925(a).

Mother raises two issues for our review:

A. Did the trial court err and commit an abuse of discretion when it determined that [Child's] best interest would be served by changing the goal from reunification to the concurrent goals of adoption and placement with a legal custodian?

B. Did the trial court err and commit an abuse of discretion when it determined that the best placement for [Child] was with [Aunt] in Utah, even though contact with Mother would be almost impossible?

Mother's Brief at 3. Because the issues are necessarily intertwined, we consider them together.

Our standard of review in dependency cases requires us to review the trial court's decision for an abuse of discretion. We must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record," but we need not accept "the lower court's inferences or conclusions of law." *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). Further, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations." *In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008) (quoting *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006)) (emphasis in original). "In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the

trial court, and the parent's rights are secondary." *In re D.P.*, 972 A.2d 1221, 1227 (Pa. Super. 2009).

The relevant statute provides in pertinent part:

**(a) General rule.--**If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the safety, protection and physical, mental, and moral welfare of the child:

* * *

(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child.

* * *

**(e) Permanency hearings.--**

(1) The court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. . . .

* * *

**(f) Matters to be determined at permanency hearing.--** At each permanency hearing, a court shall determine all of the following:

- 8 -

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

(7) If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

* * *

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

\* \* \*

**(f.1) Additional determination.--**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

42 Pa.C.S.A. § 6351.

> When the court allows CYS to change the goal to adoption, it has decided "CYS has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition." *In re A.L.D.*, 797 A.2d 326, 339 (Pa. Super. 2002).

*In re S.B.*, 943 A.2d at 978.

Mother argues that the trial court erred in changing the goal to adoption when Child had been in foster care only for three months and the previous two times Child had been in care, Child was returned to Mother. Mother also argues that there were other placement options besides Aunt that would have permitted reunification to remain the goal. Mother contends that it is not in Child's best interest for the court to limit contact with Mother, as the Utah move would require. Mother's Brief at 9-12.

At a permanency hearing, the court must determine whether the current placement continues to be best-suited for the child's needs and interests. 42 Pa.C.S.A. § 6351(e). The court must consider the progress toward alleviating the circumstances that led to placement and the appropriateness of the current goal for the child. 42 Pa.C.S.A. § 6351(f). Although the court is required to consider whether termination of parental rights should be filed if the child has been in placement fifteen out of the last twenty-two months, *see* 42 Pa.C.S.A. § 6351(f)(9), there is no specified amount of time that a court must give a parent before a goal change may be considered.

Here, the trial court properly considered that, although Child had only been in placement three months during the current dependency, Child had been in placement a total of twenty-eight months since December of 2010. The history of the case demonstrated that, while Mother might make progress, she was unable to sustain that progress, and Child has been returned repeatedly to the Agency's care after short periods in Mother's custody. The court also considered Ms. Hoke's testimony that Mother was not complying with the service plan, and that Mother's visitation with Child was difficult and included an incident when Mother attempted to remove Child from the Agency. Further, the record supports the trial court's finding that Mother was not capable of caring for Child. Mother's testimony was rambling, inconsistent, and sometimes incoherent.[4]

_____

[4] For example, in explaining the incident in which she was accused of walking around town without clothes, Mother offered the following testimony:

> I know exactly where that came from, a gossiper who has connections with the police because she's the one who was gossiping with him while they tried to falsely commit me the last time they took my son illegally without allowing me to have my Fourth Amendment rights to retreat into my home for safety for my family.

Notes of Testimony, 11/10/2014, at 28. When explaining why she was no longer seeing her therapist, Mother stated:

> Whatever the police told her, [the therapist] has stopped seeing me. But she did say that I was able to work, which is why I reopened my business, Crystal's Spirit Shop of reading tarot

*(Footnote Continued Next Page)*

The statute contemplates that a child may be placed with a relative who is qualified to care for the child. 42 Pa.C.S.A. § 6351(a)(2)(i). Based upon the findings that the court makes at a permanency review, the court shall determine whether the goal should remain reunification or change to adoption or placement with a legal custodian. 42 Pa.C.S.A. § 6351(f.1).

Although the Agency was concerned about the depth of relationship between Aunt and Child, the Agency now is satisfied with that relationship. Ms. Hoke testified that she had observed phone contact between Aunt and Child, and that Child was comfortable with Aunt. Notes of Testimony ("N.T."), 11/10/2014, at 10-11. Further, Ms. Hoke opined that Child understood that he would be living with Aunt and what the move to Utah would entail. *Id.* at 11-12. Child believed that he would like living with Aunt. *Id.* at 11.

Given the record, the trial court did not abuse its discretion in determining that Mother was unable to care for Child and that the current goal of reunification was no longer in Child's best interest. Child's best interest is paramount in this determination. *See D.P.*, 972 A.2d at 1227. Here, Mother repeatedly has made progress, only to revert to the behaviors that have caused Child to become dependent. Mother has refused the

_(Footnote Continued)_ ————————

> cards and such and I have had it used against me, my religion which no one knows what it is because I haven't decided yet.

*Id.* at 29-30.

Agency's assistance. The record makes clear that Mother's mental health problems remain untreated. Aunt has offered herself as a resource for Child, has developed a relationship with Child, and has become a licensed foster parent. Aunt offers Child stability and permanency that Mother has been unable to provide. Thus, the trial court did not abuse its discretion in putting Child's best interests first in changing Child's placement goal and in ordering Child to live with Aunt.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/23/2015