**In the Matter of S.B., a Minor.**

**Appeal of M.O. and A.B., Natural Parents.**

Superior Court of Pennsylvania.

Submitted Jan. 8, 2008.
Filed Feb. 21, 2008.

Jacqueline M. Verney and Megan A.E. Riesmeyer, Carlisle, for appellants.

Lindsay D. Baird, Carlisle, for Cumberland County Children and Youth Services, appellee.

Kathleen K. Shaulis, Carlisle, for Guardian Ad Litem.

BEFORE: LALLY–GREEN, GANTMAN, JJ., and McEWEN, P.J.E.

OPINION BY GANTMAN, J.:

¶ 1 Appellants, M.O. ("Mother") and A.B. ("Father") appeal from the order entered in the Cumberland County Court of Common Pleas, changing their family goal from "return home" to adoption with respect to their minor child S.B. (DOB 8/27/99). Upon a thorough review of the record and the applicable law, we affirm.

¶ 2 The relevant facts and procedural history of this case are as follows. Father had custody of S.B. from birth until Cumberland County Children and Youth Service ("CYS") became involved; however, S.B. was primarily living with her paternal step-grandmother and grandfather during this time. Mother had no contact or involvement with S.B. for the first few years of her life. On July 2, 2003, S.B.'s step-grandmother brought S.B. to the hospital with complaints of sexual assault. Step-grandmother alleged Father had sexually assaulted S.B. Father denied the allegations. The court found by clear and convincing evidence that S.B. had been sexually molested, but the perpetrator was not identified.

¶ 3 On August 4, 2003, S.B. was placed in the care of step-grandmother and grandfather. Step-grandmother and grandfather subsequently separated, and the court placed S.B. in foster care in January 2004. On January 28, 2004, Mother filed a petition to obtain custody of S.B., which the court denied. On February 18, 2004, the court ordered S.B. to remain in foster care, but it listed Mother, Father, step-grandmother and grandfather as viable resources for S.B., and ordered them to comply with their permanency plans. The court also ordered S.B. to begin play therapy, which began in March 2004.

¶ 4 During 2004 and 2005, Mother and Father obtained substantial compliance with their permanency plans, but step-grandmother and grandfather were removed as resources for S.B. After a permanency hearing on March 23, 2005, the court concluded there was continued dependency but the permanency goal remained "return home." On September 16, 2005, the court concluded there was contin-

ued dependency, but the parties were making progress toward reunification. The court conducted a permanency hearing in April 2006, twenty-seven (27) months after S.B.'s initial placement. Following the conclusion of this hearing, all parties filed briefs, and on July 12, 2006, the court changed the goal from "return home" to adoption. On August 7, 2006, the court vacated its order of July 12, 2006 and changed the goal back to "return home" based on recent legal authority.

¶ 5 The court held additional permanency hearings on October 4, 2006, October 17, 2006, and December 20, 2006. On January 24, 2007, the court again changed the family goal from "return home" to adoption, based on more recent legal authority as well as the facts of the case. Thereafter, the court again vacated its goal change order, this time to hear the parents' motion for reconsideration, which it denied on March 21, 2007, and reentered its order of goal change to adoption. S.B. has remained in the same, pre-adoptive foster home since her initial placement in January 2004. Mother and Father timely filed a joint notice of appeal on April 20, 2007. On May 2, 2007, the court ordered Mother and Father to file a statement of matters complained of on appeal per Pa.R.A.P. 1925(b), which they timely filed on May 16, 2007.

¶ 6 On appeal, Mother and Father raise three issues for review:

DID THE TRIAL COURT ERR AS A MATTER OF LAW IN CHANGING THE CHILD'S GOAL FROM RETURN HOME TO ADOPTION WHEN MOTHER AND FATHER COMPLETED THEIR PERMANENCY PLANS, THE CIRCUMSTANCES THAT NECESSITATED PLACEMENT NO LONGER EXIST, AND REASONABLE EFFORTS TO REUNITE THE CHILD WITH PARENTS WERE NOT MADE?

DID THE TRIAL COURT ERR AS A MATTER OF LAW IN REFUSING TO ALLOW CROSS–EXAMINATION OF THE CHILD'S PLAY THERAPIST, CONCERNING HER NOTES FROM THE BEGINNING OF THERAPY?

DID THE TRIAL COURT ERR AS A MATTER OF LAW IN NOT CONSIDERING SUBSIDIZED PERMANENT LEGAL CUSTODIANSHIP?

(Mother's and Father's Brief at 7).

¶ 7 In their first issue, Mother and Father argue they have each complied with their permanency plans within a reasonable period without relapse. They claim the circumstances that led to S.B.'s placement have been alleviated because Father was never convicted of, or charged with, the sexual assault of S.B., and Mother is not a suspect. Mother and Father contend they have repeatedly demonstrated their concern for S.B.'s best interests and have shown the court that her best interests would be served by reunification.

¶ 8 Mother and Father also assert they share a significant bond with S.B., as recognized by the court through the testimony of a psychiatrist who conducted bonding evaluations as well as Mother's parent trainer. Mother and Father state that while S.B. expresses she feels safe with her foster mother, this is only because she has lived with her foster mother for three years. Further, Mother avers she has expressed an interest in participating in S.B.'s play therapy, as well as an interest in therapy dealing specifically with families and child victims of sexual abuse, but CYS refused her request. Mother and Father argue the court's reasoning, which states S.B.'s emotional instability is an impediment to reunification, is not sufficiently compelling to change S.B.'s placement goal

to adoption. In fact, Mother and Father emphasize, this is a reason to change the goal back to "return home."

¶ 9 Mother and Father claim CYS did not make reasonable efforts to reunite them with S.B. They assert reunification services were only provided to Mother upon her request. Mother and Father stress the parent trainer could have helped to reunite them with S.B., had the goal not changed to adoption. Mother also states the parent trainer did not have any concerns regarding Mother's behavior with S.B. Further, Mother and Father assert they have been provided with only minimal opportunities to cultivate their bonds with S.B., despite their continuous requests for family counseling and increased visitation. Mother and Father conclude that adoption is not an appropriate goal, based on their substantial compliance with the permanency plan and the bond they share with S.B. For the following reasons, we cannot agree.

¶ 10 In cases involving a court's order changing the placement goal from "return home" to adoption, our standard of review is abuse of discretion. *In re N.C.,* 909 A.2d 818, 822 (Pa.Super.2006). To hold the trial court abused its discretion, we must determine its judgment was "manifestly unreasonable," that the court disregarded the law, or that its action was "a result of partiality, prejudice, bias or ill will." *Id.* (quoting *In re G.P.-R.,* 851 A.2d 967, 973 (Pa.Super.2004)). While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a "responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." *In re A.K.,* 906 A.2d 596, 599 (Pa.Super.2006). Therefore, our scope of review is broad. *Id.*

¶ 11 Section 6351(f) of the Juvenile Act in relevant part provides:

**§ 6351. Disposition of dependent child**

* * *

**(f) Matters to be determined at permanency hearing.—**

At each hearing, the court shall:

(1) determine the continuing necessity for and appropriateness of the placement;

(2) determine the appropriateness, feasibility and extent of compliance with the permanency plan developed for the child;

(3) determine the extent of progress made toward alleviating the circumstances which necessitated the original placement;

(4) determine the appropriateness and feasibility of the current placement goal for the child;

(5) project a likely date by which the goal for the child might be achieved;

(6) determine whether the child is safe;

* * *

(9) if the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the home or to preserve and reunify the family need not be made or continue to be made, determine whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's home within the time frames set forth in the permanency plan.

42 Pa.C.S.A. § 6351(f). The trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents. *Id.* "Safety, permanency, and well-being of the child must take precedence over **all** other considerations." *In re N.C., supra* at 823. Further, at the review hearing for a dependent child who has been removed from the parental home, the court must consider the statutorily mandated factors. *Id.* "These statutory mandates clearly place the trial court's focus on the best interests of the child." *In re A.K., supra* at 599.

¶ 12 When parents have cooperated with the agency, achieved the goals of their permanency plans, and alleviated the circumstances that necessitated the child's original placement, the agency should continue to put forth efforts to reunite the child with her parents. *In re A.K., supra.* However, "when the child welfare agency has made reasonable efforts to return a foster child to ... her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *In re N.C., supra* at 823.

¶ 13 Although a goal change to adoption is a step towards termination of parental rights, it does not in fact terminate parental rights. *Id.* When the court allows CYS to change the goal to adoption, it has decided "CYS has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition." *In re A.L.D.,* 797 A.2d 326, 339, (Pa.Super.2002) (citation omitted). Once the goal is changed to adoption, CYS is not required to provide further services. *Id.*

¶ 14 In the case of *In re A.K., supra,* the trial court ordered the goal change to adoption because the parents refused to accept responsibility for the abuse of their children. The father was sentenced to a term of three (3) to ten (10) years' incarceration for perpetrating the abuse, while the mother received a sentence of four (4) to twelve (12) months' incarceration for her passive role in the abuse. On appeal, however, this Court held there was no continued threat to the children, and the agency should continue efforts to reunite the children with their mother. This Court stated both parents had, in fact, accepted responsibility and made progress toward alleviating the circumstance which necessitated the original placement. The Court reasoned both parents had pled guilty to the child endangerment charges, and, because the father would be in prison for three (3) to ten (10) years, he did not pose a continuing threat to the girls. Further, the mother was successful in meeting the requirements of her permanency plan, her interaction with the children was appropriate, and a bond with her children was evident.

¶ 15 In the more recent decision of *In re N.C. supra,* the trial court focused on the best interests of the children and granted a goal change to adoption, despite the fact that the mother had made substantial progress toward completing her permanency plan. On appeal this Court affirmed, holding that the mother's par-

enting skills and judgment regarding her children's emotional well-being remained problematic. Additionally, this Court reasoned the trial court's fact-finding process was very thorough and deliberate in that it conducted several hearings with numerous witnesses, and also considered the input of the *guardian ad litem* as well as the thirteen (13) year old child. This Court affirmed the goal change, as it was in the child's best interests. *Id.*

■ ¶ 16 In the instant case, S.B. was removed from Father's custody when she was three years old, after her paternal step-grandmother alleged Father had sexually molested S.B. The allegations did not result in a charge or conviction against Father, but the court found by clear and convincing evidence that **someone** had sexually molested S.B. Regardless of who the actual perpetrator was, S.B. believes her Father "hurt" her. Meanwhile, Mother was not even involved with S.B. for the first four (4) years of her life. Mother became involved only when S.B. was placed in foster care in January 2004. S.B. has remained in the same foster home since the original placement.

¶ 17 Initially, CYS set Father and Mother's permanency goal as "return home." The court found this goal appropriate and ordered S.B. to begin therapy as early as possible, due to her fragile emotional state resulting from the sexual abuse. S.B. began play therapy with Bridget Weible in early 2004; S.B. continues to see Ms. Weible. Ms. Weible has stated S.B.'s emotional well-being depends on a living environment where she feels safe and secure. The court subsequently found the foster mother was the only person who successfully provided S.B. with this safe environment, and returning S.B. to the care of either parent would pose a serious threat to her emotional well-being. Further, the court found family counseling with Mother and Father was not in S.B.'s best interests.

¶ 18 The court candidly reasoned as follows:

Despite the fact that the parents had substantially complied with their permanency plans, we changed the goal from "return home" to "adoption" in July of 2006 because we were convinced that it would best serve S.B.'s needs and welfare. Shortly thereafter the Superior Court issued a decision which indicated that "adoption should not be an option for goal change when the parent has complied with (the) permanency plan." *[In re] A.K., supra.* Based upon that decision, and in response to petitions filed by the parents and unopposed by the other parties, we vacated our order and reinstate the goal of return home. Before the conclusion of the latest permanency hearing, the Superior Court decided *[In re N.C., supra].* In *N.C.,* as in the instant case, the emotional damage was done to the child before he was placed. Despite mother's substantial compliance with the permanency plan, N.C. could not sufficiently overcome his emotional trauma to be reunited with her.

\* \* \*

In the case before us, if we focus upon the best interests of the child, there is no question that the goal should be changed to adoption. S.B. has been in placement since January 2004. While the parents have made substantial progress in connection with their permanency plans, neither is in a position to meet the child's emotional needs by providing her a home in which she feels safe. While we could not find by clear and convincing evidence that [F]ather sexually molested this young child, we did find that she had been sexually molested by someone. We were also convinced

that S.B. **thinks** that her father molested her.

Furthermore, in November of 2006[F]ather submitted to a Psychosexual Assessment.[7] The evaluator included the following relevant findings.

---

7. We note that Father was requested to submit to such an assessment early in [S.B.]'s placement, but refused to do so.

[Father's] responses to questions specifically related to childhood sexual abuse are concerning. His answers indicate that he believes that child victims gain some benefit from their experiences and are not as damaged as others might believe, that child victims contribute in some ways to their own victimization experiences, and that others overreact to childhood sexual abuse, including longer than necessary sentences for child molesters. . . . It is a concern to note [Father] reported attitudes supportive of a child sexual abuse and based his responses on childhood events and relationships rather than on his role as a parent.

\* \* \*

[Father] did not at any time initiate any discussion of S.B. allegations of his sexual abuse [with] her or offer speculation on what might have happened. He did not address the court's determination that S.B. had been sexually abused by someone, nor did he indicate concern about the potential impact of this experience on S.B.

Her recommendations included, *inter alia,* the following:

- That [Father] receives specialized counseling to address attitudes and beliefs which are supportive of sexual assault to children.

- That [Father] receives supervision, training, and counseling to develop parenting skills based on S.B.'s needs, rather than parenting directed from his own needs and desires.

- That [Father] receive training and counseling until he is able to consistently demonstrate understanding, acceptance, and sensitivity to the impact of sexual abuse on S.B. in the context of their relationship, on S.B.'s current functioning, and on any developmental milestones in the future which may exacerbate the effects of having been sexually abused.

Mother's stability remained a concern. In fact, she had regressed significantly since the last permanency review. She had separated from her long time paramour to begin a new relationship. She had no visible means of support for herself and her children. Furthermore, there had been nine police calls to her residence during the previous year.

In addition [S.B.'s] therapist confirmed that she was not ready to be with either parent. The following exchange illustrates this point:

**BY THE COURT:**

Q. We've had so many hearings to get this particular permanency hearing done. I want to make sure that I understand your position. S.B.'s current placement is appropriate for her emotional well-being?

A. Yes, it is.

Q. If I were to place her at the current time with her mother or her father, what, if any, effect would that have upon the child?

A. I think it's likely that there's going to be regression and acting out behaviors and emotional distress.

Q. Would there be danger of any serious or permanent emotional harm to the child?

A. I think there would be danger of serious or permanent harm to the child. She doesn't feel safe in either one of these environments.

Q. Do you have a likely date by which she would progress enough that she would be safe in either of those other environments?

A. No, I don't.

[(N.T. Hearing, 1/24/07, at 43–44).]

On the other hand, [S.B.] did feel safe and secure in the foster home. She had an obvious bond with the foster mother with whom she had lived for more than three years. [H]er behavior and emotional well-being improved greatly when she was advised of our prior ruling changing the goal to adoption. It was clear that S.B. needs permanency. The goal change to adoption will achieve that for her.

(Trial Court Opinion, dated June 20, 2007, at 6–9) (some internal citations omitted). We have no reason to disturb the court's thorough and reasoned decision. The court conducted numerous hearings over the course of three years, and CYS continuously offered services to Mother and Father until the goal changed to adoption. S.B.'s emotional state has not improved to a level that would allow her to be placed with either parent. S.B.'s safety and emotional stability controls the current analysis, even in light of the parents' substantial compliance. S.B. has been in foster care for over four years; the court's decision to change the goal to adoption will permit her to have the long overdue sense of permanency she deserves. Thus, this issue warrants no relief.

¶ 19 In their second issue, Mother and Father argue they should have been permitted to cross-examine Ms. Weible regarding her notes from therapy sessions with S.B. that occurred prior to the permanency review hearing in April 2006. If they had the opportunity at the January 2007 hearings to cross-examine Ms. Weible about these notes, Mother and Father claim they could have shown the court Ms. Weible incorrectly associated some of S.B.'s behaviors with their visits. Mother and Father contend that cross-examination on these older notes would have shown the court Ms. Weible's recommendation regarding limiting continued contact between S.B. and her parents was inappropriate and did not support a goal change. Mother and Father conclude the court erred in restricting cross-examination of Ms. Weible to her notes made between April 2006 and January 2007. We disagree.

¶ 20 Initially, we note the trial court "has broad discretion over the scope of cross-examination." *Commonwealth v. Harris*, 572 Pa. 489, 528, 817 A.2d 1033, 1056 (2002), *cert. denied*, 540 U.S. 1081, 124 S.Ct. 939, 157 L.Ed.2d 756 (2003) (quoting *Commonwealth v. Rizzuto*, 566 Pa. 40, 777 A.2d 1069, 1081 (2001)). When the court has exercised its discretion with respect to allowing or limiting cross-examination, this Court will not reverse that decision absent a clear abuse of discretion or an error of law. *Harris, supra.*

¶ 21 Instantly, the trial court made all of Ms. Weible's notes available to Mother and Father, over the objection of Ms. Weible and CYS. The court then allowed Mother and Father to cross-examine Ms. Weible, but limited cross-examination to her notes from the past six months. The court reasoned:

In the interest of moving the hearing along, we ruled that the cross examination should be limited to her sessions since the last permanency review in April of 2006. We conducted numerous hearings and permanency reviews in this matter over the years. We had heard from Ms. Weible on several occasions

regarding her past treatment of the child. We did not see the need to revisit all of that testimony again.

However, despite our initial ruling, where appropriate and relevant, we did allow the attorneys to question Ms. Weible regarding notes she made for sessions prior to the last permanency review. Specifically, questions were posed regarding the initial intake in April 2004 as well as her notes from the January through March 2006 sessions.

(Trial Court Opinion at 10–11) (footnotes omitted). We see no abuse of discretion in the court's decision to restrict cross-examination in this manner, particularly as the court relaxed its ruling where appropriate and relevant. Thus, Mother's and Father's second issue merits no relief.

¶ 22 In their final issue, Mother and Father argue adoption is an unsuitable substitute for continued contact between S.B. and her parents. It is in S.B.'s best interests to maintain contact with her parents, because S.B. has formed a bond with both parents. Therefore, appointing a permanent legal custodian is a suitable alternative to adoption for S.B. Further, Mother and Father assert that subsidized permanent legal custodianship ("SPLC") is the best alternative as it guarantees continued contact. Mother and Father conclude this Court should reverse and change the permanency goal back to "return home" or to SPLC in the alternative because the best interests of S.B. call for continued contact with her parents.[1] For the following reasons, we cannot agree.

■■■■ ¶ 23 Initially, our standard of review of an order regarding a placement

goal of a dependent child is the abuse of discretion standard. *In re B.S.*, 861 A.2d 974, 976 (2004). In reviewing the court's denial of permanent legal custody, "we are bound by the facts as found by the trial court unless they are not supported in the record." *Id.* Once a child is adjudicated dependent, the court may order the family goal to be "return home;" it may terminate parental rights and place the child for adoption; or it may order the child be placed with a permanent legal custodian. *Id.*

■■■■ ¶ 24 Section 6351(f.1) of the Juvenile Act lists the court's options in determining a dependent child's placement:

### § 6351. Disposition of dependent child

\* \* \*

**(f.1) Additional determination.—** Based upon the determination made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety,

---

1. The *guardian ad litem* agrees with Mother and Father that SPLC is a viable alternative to adoption; however, this Court cannot consider "**subsidized** permanent legal custodianship" at this juncture, as the trial court must first declare the foster mother as the permanent legal custodian, and then the foster mother may apply for financial aid through CYS. Only when CYS awards the permanent legal custodian financial aid, does she become a **subsidized** permanent legal custodian.

protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

(f.2) **Evidence.**—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

(g) **Court order.**—On the basis of the determination made under subsection (f.1), the court shall order the continua-

tion, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1)(1)-(5), (f.2), (g).

SPLC transfers permanent legal custody to the dependent child's legal custodian without requiring the termination of natural parental rights. When deemed appropriate the [ ] court has the power to permit continued visitation by the dependent child's natural parents. To be eligible for SPLC, the legal custodian must meet all of the requirements for foster parenthood, submit to an annual eligibility evaluation, and have the ability to provide for the child without court supervision.

*In re B.S., supra* at 977. The court may consider permanent legal custody, upon the filing of a petition that alleges the dependent child's current placement is not safe, and the physical, mental, and moral welfare of the child would best be served if SPLC were granted. *Id.* Upon receipt of this petition, the court must conduct a hearing and make specific findings focusing on the best interests of the child. *Id.* The "court must find that neither reunification nor adoption is best suited to the child's safety, protection and physical, mental and moral welfare of the child" for the court to name the custodian a "permanent legal custodian." *Id.* (holding Section 6351(f.1) governs appointment of permanent legal custodian).

■ ¶ 25 In the instant case, after years of dependency and many permanency review hearings, the court changed the family goal to adoption with respect to S.B. During several of these hearings, the parents and the *guardian ad litem* asked the court to consider permanent legal custody as an option. When the court ultimately denied this request, it considered the legal

standard as described in *B.S., supra* and reasoned:

> [We] could not in good conscience find that adoption was not the best alternative available for S.B. She and her foster mother have formed a mutual bond of love and affection. S.B. needs permanency and her foster mother is willing to provide that by adopting her. There is every reason to believe that adoption will help her achieve the emotional healing that has eluded her to date. While she has formed a bond with both of her natural parents, it is not nearly as strong as it is with her foster mother. Furthermore, the foster mother is committed to the welfare of the child. We are absolutely convinced that she will allow S.B. to have contact with her natural parents as long as it remains in the child's best interests.

(Trial Court Opinion at 10). We see no use of an improper legal standard or an abuse of discretion in the court's decision. Here, the court conducted a thorough review of the case, heard expert witnesses, considered permanent legal custody as an option, but concluded that adoption best suited the safety and protection, physical, mental and moral welfare of S.B. Therefore, we decline to second-guess the court's decision. Accordingly, we affirm.

¶ 26 Order affirmed.