J-A06020-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: W.Z.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: Z.F., NATURAL FATHER | : | |
| | : | |
| | : | No. 796 WDA 2020 |

Appeal from the Order Entered June 25, 2020
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000007-2019

| | | |
|---|---|---|
| IN RE: X.J.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: Z.F., NATURAL FATHER | : | |
| | : | |
| | : | No. 797 WDA 2020 |

Appeal from the Order Entered June 25, 2020
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000008-2019

| | | |
|---|---|---|
| IN RE: A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: Z.F., NATURAL FATHER | : | |
| | : | |
| | : | No. 798 WDA 2020 |

Appeal from the Order Entered June 25, 2020
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000006-2019

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED: APRIL 5, 2021**

Z.F. (Father) appeals *nunc pro tunc* from the trial court's orders, entered in the Court of Common Pleas of Jefferson County, changing the permanency goals of his three minor children, W.Z.F. (born February 2016), X.J.F. (born June 2017) and A.S.[1] (born August 2012) (collectively, Children), from "return home" to adoption.  Counsel has also filed an ***Anders***[2] brief and accompanying petition to withdraw on appeal.  After careful review, we affirm and grant counsel's petition to withdraw.

On February 6, 2019, Jefferson County Children and Youth Services (CYS) filed an application for emergency protective custody of Children following concerns about Children's mother's[3] mental health, Father's and Mother's (Parents) regular drug use, and Parents' inability to properly care for Children's needs and well-being.  N.T. Adjudication Hearing, 2/27/19, at 4-5.  Parents admitted to using methamphetamines while caring for Children.  ***Id.*** at 5-6.  The trial court granted an emergency protective custody order and,

---

[1] The record indicates that Father is not A.S.'s biological father; A.S.'s biological father was deemed "unknown" at the permanency hearings.  ***See*** N.T. Permanency Hearing, 5/29/19, at 17.  However, A.S. calls Father her "dad" and Father considers A.S. his daughter.  ***Id.***  Despite the fact that Father may not have legal standing to appeal this goal-change decision with respect to A.S., we nonetheless analyze it in the interests of justice.

[2] ***Anders v. California***, 386 U.S. 738 (1967).

[3] Mother is not a party to this appeal.

following a hearing on February 11, 2019, a shelter order was also entered.[4]

Children were initially placed in foster care, and then were moved to a kinship

home with Father's sister-in-law, where they remain to date.[5] After an

adjudicatory hearing, Children were declared dependent on February 27,

2019. CYS set the following service plan goals for Father: attend drug and

alcohol and mental health counseling; obtain suitable housing; attend anger

management classes; and maintain employment.

The court held permanency hearings in May, August, and December of

2019, and, again, in June 2020.[6] At the May 2019 permanency hearing, the

court determined that Children remained dependent, but noted that Father

had been successfully discharged from St. Joseph's inpatient treatment

facility, **see infra** n.5., was employed, and that Father's home was

appropriate for Children. N.T. Permanency Hearing, 5/29/09, at 4-6.[7] Due to

Father's notable progress, CYS put in place an 11-week reunification plan to

have Children placed returned home. **Id.** at 7, 13. A bonding assessment

---

[4] Father tested positive for amphetamine, methamphetamine, marijuana, and ecstasy on the day of the shelter care hearing. **Id.** at 6.

[5] Father participated in the hearing by telephone. **Id.** at 3. At the time, he was in in-patient drug and alcohol treatment at St. Joseph's. **Id.** at 6.

[6] The March 2019 hearing was continued to June 2019 due to the global COVID-19 pandemic.

[7] At that time, Father was having supervised visits with Children for approximately three hours per week. **Id.** at 7.

was also conducted on Father; the assessment noted that while reunification remained the appropriate goal, the reporting psychologist also expressed concerns about Father's drug issue and highlighted the need for plan compliance and therapy.

At the next permanency hearing held in August 2019, the court recognized that Father had relapsed in July and had failed to provide clean drug screens prior to scheduled visits.[8] As a result, visits were suspended on July 11, 2019. N.T. Permanency Hearing, 8/28/19, at 5. CYS also noted that Father had not been consistent with telephone contact with Children. *Id.* at 6. The court noted that Father was participating in drug and alcohol counseling, but had not enrolled in recommended in-patient rehabilitation. *Id.* at 8. However, the court reiterated that the "main goal is [still] reunification." *Id.* at 23.

At the December 2019 permanency hearing, Father had had only one two-hour visit since the last hearing due to his attending a rehabilitation program. *Id.* at 5. While Father had successfully completed his rehabilitation program, he still had not participated in drug and alcohol counseling, mental health counseling, or anger management. CYS noted that Father was in the

_____

[8] In fact, on the day of the August 28, 2019 hearing, Father tested positive for methamphetamines, amphetamines, and ecstasy. *Id.* at 18.

process of setting up his counseling and anger management sessions, but was experiencing difficulty securing transportation. *Id.* at 6-7.[9]

On June 18, 2020, Father failed a drug test —less than one week before the next scheduled permanency hearing.[10] N.T. Permanency Hearing, 6/24/20, at 5-6. At the June 24, 2020 permanency hearing, the court noted that Father was inconsistently attending his drug and alcohol counseling— missing as many as 24 sessions—and that Father had declined to attend recommended inpatient rehabilitation. *Id.* at 10, 12, 42. Father refused to sign a release for CYS to obtain Father's hospital records when he had allegedly been admitted for a drug overdose, claiming "that's not information [they] needed." *Id.* at 14. Finally, Father was facing an impending eviction. Father testified that he had tested negative for drugs 18 times since the prior hearing in December 2019, that he had completed anger management counseling, and attempted to explain the reasons for missing his counseling sessions (e.g., sleeping in, death of father, and depression). *Id.* at 53. Finally, Father denied having failed the June drug test and using drugs at that time.[11] At the conclusion of the hearing, CYS recommended the goal be

---

[9] As Parents were faced with eviction at the end of the month, the court entered an order permitting Parents to remain in public housing for an additional three months. *Id.* at 15.

[10] Father tested positive for methamphetamines at the June 2020 drug test. *Id.* at 6.

[11] CYS caseworker Emily Feicht testified that prior to the COVID-19 pandemic, Parents were having two-hour, supervised visits with Children and half-hour

changed to adoption, noting that Children have been thriving in kinship care, an adoptive resource, and the need for Children to achieve permanency in their lives. *Id.* at 18, 35-36.

The trial court changed Children's goals to adoption, noting that Parents had failed, over the course of 15 months and 29 days, to accomplish their service goals, despite reasonable efforts by CYS to finalize the permanency plans. *Id.* at 65. The court also noted that Father's missed sessions and failure to remain drug-free inhibited permanency for Children, which they deserve. *Id.* at 65-66. Thus, on June 25, 2020, the court entered three orders changing Children's permanency goal to adoption. Father sought and was granted leave to file a *nunc pro tunc* notice of appeal. Father also filed a timely Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He presents one issue for our consideration: "Whether the lower court erred in changing the permanency placement goal to adoption?" *Anders* Brief, at 4.

Before reaching the merits of Father's issue, we must first address whether counsel has properly sought to withdraw from this appeal. In *In re J.D.H.*, 171 A.3d 903, 906 (Pa. Super. 2017), this Court extended the *Anders* procedure to appeals from goal change orders, even in the absence of an

---

video calls three times a week. *Id.* at 7. She testified the in-person visits went "pretty well," *id.*, but that CYS was concerned that Parents were not feeding Children during dinner time. *Id.* at 7-8. However, since COVID, there had only been one visit with Children. *Id.* at 9.

involuntary termination decree. Pursuant to **Anders**, certain requirements must be met, and counsel must:

> (1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous;
>
> (2) furnish a copy of the [**Anders**] brief to the [appellant]; and
>
> (3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy [of] the court's attention.

**Commonwealth v. Cartrette**, 3 A.3d 1030, 1032 (Pa. Super. 2013) (en banc) (citation omitted). With respect to the third prong, this Court has held that counsel must "attach to [his or her] petition to withdraw a copy of the letter sent to [his or her] client advising him or her of their rights." **Commonwealth v. Millisock**, 873 A.2d 748 (Pa. Super. 2005). In addition, an **Anders** brief must comply with the following requirements:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Commonwealth v. Santiago**, 978 A.2d 349, 361 (Pa. 2009).

Upon review, it appears that counsel has complied with the procedural requirements of **Anders** and its progeny. Counsel filed a petition to withdraw,

certifying that he has reviewed the case and determined that Father's appeal is frivolous. Counsel has also filed a brief, which includes a summary of the history and facts of the case, a potential issue that could be raised by Father, and counsel's assessment of why that issue is frivolous, with citations to the record and to relevant legal authority. *See Santiago*, *supra*. Finally, counsel has sent Father a letter advising him of his rights pursuant to *Millisock*, *supra*.[12] Because counsel has complied with the requirements of *Anders* and *Santiago*, we must now "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." *Commonwealth v. Flowers*, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

In his *Anders* brief, counsel contends that the trial court erred in changing Children's permanency goal to adoption where such a change is not in Children's best interests. *Anders* Brief, at 8. With regard to goal change, our standard of review is well-settled:

> In cases involving a court's order changing the placement goal . . . to adoption, our standard of review is [for an] abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was "manifestly unreasonable," that the court disregarded the law, or that its action was "a result of partiality, prejudice, bias or ill will." While this Court is bound by the facts determined in the trial court, we are not tied to the

---

[12] Although counsel did not initially attach a copy of this letter to his petition to withdraw, *see* Superior Court Order, 11/25/20, on November 16, 2020, counsel sent Father the required letter attaching all relevant *Anders* documents and notifying Father of his right to hire private counsel, proceed on his own, or raise any issues he deems meritorious to the Court. *See* Appeal of Goal Change Letter by J.D. Ryan, Esquire, 11/16/20.

court's inferences, deductions and conclusions; we have a "responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record."

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted). "The trial court must focus on the child[ren] and determine the goal[s] with reference to the child[ren]'s best interests, not those of the parents." *Id.* at 978. Moreover, "[s]afety, permanency, and well-being of the child[ren] must take precedence over **all** other considerations." *Id.* (citation omitted; emphasis in original).

At each permanency hearing, the court shall determine, among other things, "the continuing necessity for and appropriateness of the placement" of a child, as well as whether efforts to reunify the family need to be made or should continue being made, where aggravated circumstances exist. *See* 42 Pa.C.S. §§ 6351(f)(1), (9). When parents have cooperated with the agency, achieved the goals of their permanency plans, and alleviated the circumstances that necessitated the child's original placement, the agency should continue to put forth efforts to reunite the child with his parents. *In re A.K.*, 906 A.2d 596 (Pa. Super. 2006). However, "when the child welfare agency has made reasonable efforts to return a . . . child to . . . [his or] her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006).

In *In re N.C.*, *supra*, mother argued on appeal that the trial court erred in changing her children's placement goal to adoption where she had largely

complied with the goals of her permanency plan, alleviated the circumstances that had led to the children's original placement, and had diligently worked to be reunified with children. *Id.* at 824. On appeal, our Court noted that the focus of dependency proceedings is on the children's safety and well-being, not parental conduct. Where mother's parenting skills, including her judgment, remained problematic, and where mother refused to acknowledge the significant amount of time her children had been in placement and the damage associated with that placement, our Court concluded that the trial court did not abuse its discretion in changing the placement goal. *Id.* at 827-28.

Similarly, here, after careful review of the record, we discern no abuse of discretion in the trial court's decision to change Children's permanency goals from "return home" to adoption where: Father made minimal progress toward alleviating the circumstances which necessitated Children's original placement; he relapsed with drug use; he refused to attend recommended in-patient treatment; he missed more than one-third of his alcohol and drug counseling sessions; and he failed to take advantage of telephonic visits with Children. *In re N.C.*, *supra*. As the trial court astutely noted, "Father's conduct during the first half of 2020 indicated that sobriety and reunification were no longer paramount in his mind." Trial Court Opinion, 9/22/20, at 2. Under such circumstances, goal change was clearly in the best interests of Children. *In re S.B.*, *supra*.

Orders affirmed. Petition to withdraw granted.

J-A06020-21

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/5/2021