J-S21013-24
J-S21014-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 362 EDA 2024 |

Appeal from the Order Entered December 21, 2023
In the Court of Common Pleas of Pike County Civil Division at No(s):  CP-52-DP-0000006-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: C.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: O.Z., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 363 EDA 2024 |

Appeal from the Order Entered December 21, 2023
In the Court of Common Pleas of Pike County Civil Division at No(s): CP-52-DP-0000006-2023

BEFORE:  LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED JULY 30, 2024**

S.M. (Father) and O.Z. (Mother)[1] appeal from the order, entered in the

Court of Common Pleas of Pike County, changing the placement goal—from a

---

[1] We have *sua sponte* consolidated Father's and Mother's appeals at 362 EDA 2024 and 363 EDA 2024.  **See**  Pa.R.A.P. 513.

concurrent goal of reunification and adoption to adoption alone—with regard to their child, C.M. (Child) (born 5/19).[2]  After careful review, we affirm.

Child suffers from severe developmental delays, is non-verbal, and is on the autism spectrum.  In December 2022, a Pike County Children and Youth (CYS) caseworker, who was visiting Father's home that he shared with Child and Father's girlfriend and her two children,[3] observed a padlock on the outside of Child's bedroom door that, although unlocked, prevented Child from opening the door.  Upon opening the door, the caseworker observed an unlit room with a mattress on the floor and feces smeared on the wall.  In February 2023, a CYS caseworker visited Father's home unannounced, observing once again a padlock on Child's bedroom door.  *See* N.T. Permanency Review/Goal Change Hearing, 12/20/23, at 8.  CYS called the Pennsylvania State Police (PSP) immediately; the PSP conducted a search of the home and discovered Child padlocked in the unlit bedroom.  *Id.*  Child was naked, covered in feces, and the walls were smeared with feces.  *Id.*  A bare mattress, laying on the

---

[2] Orders granting or denying a goal change, in a case involving a dependent child, are final and appealable.  *In re H.S.W.C.-B.*, 836 A.2d 908, 911 (Pa. 2003).

[3] The record reveals that since April 2022, CYS had been involved with Father's girlfriend's family following the death of girlfriend's children's father. Specifically, CYS tried to provide the family services to address issues of truancy, trauma, and grief, and also responded to reports of unsupervised children in the home, dental neglect, and concerns regarding the children's behaviors.  *See* CYS Emergency Shelter Care Application, 2/14/23, at 4.

floor of the room, was covered in fecal matter, urine stains, and dead bugs. The room had a terrible smell and diapers and garbage were strewn throughout the room. Father and his girlfriend were arrested. At this time, Mother was involved in unrelated dependency proceedings in Columbia County due to an incident involving her infant child.

On February 13, 2023, the court granted CYS emergency protective custody of Child. On February 16, 2023, a shelter care order was entered granting physical and legal custody of Child to CYS and placing Child in foster care with his current foster care family which is an adoptive resource and has specialized knowledge of caring for children with developmental delays/disabilities.[4] On February 17, 2023, CYS filed a dependency petition; an adjudicatory hearing was held on February 27, 2023. Following the hearing, the court entered an order: (1) declaring Child dependent; (2) concluding that Child was the victim of abuse, having "suffered from serious physical neglect which threatened [C]hild's life, development[,] and health," 23 Pa.C.S.A. § 6303; (3) and determining that Father was Child's abuser and was "responsible for [Child's] serious physical neglect and endangerment."

---

[4] Testimony established that Child is level 2/3 on the autism spectrum. "The [Diagnostic and Statistical Manual of Mental Disorders] (DSM) level 2 expression of autism includes people [who require substantial support and] who have very specific interests and who engage in repetitive behaviors that veer far from accepted, neurotypical behaviors or that appear in spaces neurotypical people view as incongruous." **See** https://www.verywellhealth.com/what-are-the-three-levels-of-autism (last visited 6/12/24).

Adjudicatory and Dispositional Order, 2/27/23. On April 27, 2023, the court appointed Gail Sebring as Child's Court Appointed Special Advocate (CASA).[5] *See* Order, 4/27/23.

In February 2023, CYS identified O.Z. as Child's mother. Mother had not seen Child in approximately two years; Mother was involved in an open dependency case, regarding her other children, in Columbia County and was not permitted to have unsupervised contact with those children. In the instant matter, Mother initially complied with her permanency plan by engaging in visit coaching sessions with the Justice Works Program (JWP), completing a nurturing parenting program, and registering for the ABA Parenting Coaching program with Easter Seals. *See* Permanency Plan (Revised), 9/13/23, at 2, 11. Mother's service plan, as of March 20, 2023, required her, in part, to complete the following tasks by March 13, 2024: complete a mental health evaluation and follow provider recommendations; complete a parental fitness evaluation and follow all recommendations; and, participate in nurturing parenting program through JWP and follow all provider recommendations. *Id.*

---

[5] "CASA aims to connect children being served by dependency courts with volunteer advocates who collect pertinent information about a child's case to help the court act in the best interest of the child. A CASA volunteer gathers pertinent information about the case by talking to the child, family[,] and foster family and relaying the information to the [j]udge during [c]ourt hearings." *See* https://www.pikepa.org/health___safety/casa.php (last visited 7/3/24).

at 17. *See also id.* at 12-17 (listing remaining tasks for Mother to accomplish under parenting plan).

In June 2023, Father pled[6] guilty to three counts[7] of endangering the welfare of children (EWOC) (F-3), and, pursuant to a negotiated plea agreement, was sentenced in August 2023 to three concurrent sentences of 14-60 months' incarceration, with 185 days of credit for time served.[8]

On August 2, 2023, the court held a permanency hearing, after which it determined that visitation between Child and Father would be contrary to Child's safety and well-being. Specifically, the court found that "Father is incarcerated and facing sentencing for offenses against [C]hild. [C]hild suffers from severe developmental disabilities which render him non-verbal. This court found [C]hild to be a victim of abuse at the hands of Father. The [c]ourt finds that visitation in a correctional facility [is] not suited to the well-being of [C]hild." Permanency Review Order, 8/2/23, at 6. At that time the court also determined Mother had substantially complied with the permanency plan, but had made no progress toward alleviating the conditions that led to Child's

---

[6] Father is also a Tier-2 sexual offender after a prior conviction of unlawful contact with a minor, not Child.

[7] The counts related to Child and Father's girlfriend's two children.

[8] Although there is not a no-contact provision in Father's sentencing order, a condition of Father's bail precluded him from having contact with Child. *See* Father's Brief, at 8.

placement. Father was found to have only minimally complied with the service plan and had made no progress toward alleviating the conditions leading to Child's placement. *See id.* at 1-2.

On October 6, 2023, CYS filed a petition to change the placement goal to adoption. On December 20, 2023,[9] the court held consolidated permanency review and goal change hearings at which CYS Caseworker Bernadette Perry, JWP Director Theresa Fondalledas, Father, and Mother testified. At the hearing, Father's counsel argued that the court should deny the goal change petition and give Father "a chance to have visitation with [Child] at SCI Dallas." N.T. Permanency/Goal Change Hearing, 12/20/23, at 58. After the hearing, the court granted CYS' goal change request. The court also entered a permanency review order reflecting the changed goal and noting that Father (who was incarcerated at SCI Dallas with no definitive release date)[10] and Mother had made no progress in alleviating the circumstances the led to Child's original placement, that Mother and Father minimally complied with

_____

[9] Child had been in placement for approximately 10 months at the time of the goal change hearing.

[10] However, CYS caseworker Perry acknowledged at the goal change hearing that Father may be eligible for parole "at some point in the near future." *Id.* at 26. Moreover, Father testified that he was "hoping" he would be paroled in April or May 2024, when he completes his program at the expiration of his minimum sentence, because he was on short sentence parol (SSP). *Id.* at 41, 46. *See* 204 Pa. Code § 309.1(b).

the permanency plans, and that CYS had made reasonable efforts to finalize Child's permanency plan. *Id.* at 60.

On appeal, Father and Mother present the following issues for our consideration:

> (1) Whether the [t]rial [c]ourt erred as a matter of law and abused its discretion in changing [C]hild's permanency goal from reunification to adoption.

> (2) Whether the [t]rial [c]ourt erred as a matter of law and abused its discretion in finding that it was in the best interest of [C]hild to change the permanency goal from reunification to adoption.

Father's Brief, at 4; Mother's Brief, at 7. Father also raises a third issue: "Whether the [t]rial [c]ourt erred as a matter of law and abused its discretion in determining that visitation between [C]hild and [F]ather is contrary to the safety and well-being of [C]hild?" Father's Brief, at 4.

Father contends that the trial court improperly changed the permanency goal from reunification to adoption where he "presented evidence that he has taken accountability for his actions that led to the . . . placement of [C]hild, [has] attempt[ed] to comply with the [c]hild [p]ermanency [p]lan[,] and ma[de] progress towards alleviating the circumstances that led to placement." Father's Brief, at 7. Father also claims that because CYS requested a goal change after Child had been in placement for only 8 months, he was not given "ample time and opportunity in which to remedy any incapacity, abuse[,] and/or neglect . . . [and that CYS did not present sufficient evidence] to show that the change in goal promoted the best interest[s] of [C]hild." *Id.* Mother

argues that she has made the "necessary progress to return [C]hild to her, or at the very least, for th[e court] to find that a compelling reason existed to provide her additional time to continue to make progress towards that goal." Mother's Brief, at 10. Moreover, Mother claims that the court "ignored Mother's progress, added a [42 Pa.C.S.A. § 6351(f)] requirement[, and] discounted her improved parental environment and ability [to parent]." *Id.*

Our standard of review of a goal change is as follows:

When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is [an] abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias[,] or ill[-]will, as shown by the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In the Interest of S.G.*, 922 A.2d 943, 946-47 (Pa. Super. 2007) (citations and quotations omitted). *See also In the Interest of R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (appellate court not required to accept trial court's inferences or conclusions of law). We also recognize that in matters of placement for a dependent child, the trial court must be guided by the best interests of the child, not those of his or her parents. *See In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006).

Instantly, the trial court stated the following on the record at the goal change hearing:

The current placement goal [] needs to be changed. I am going to grant the modification of placement to a goal of adoption. This is a situation in which there are unique circumstances.

With respect to Father, [C]hild was the victim of the crime and I do believe that any decision to the contrary [] would be a grave threat of harm to [C]hild who suffers [from] autism and who was put through some horrific abuse which has been charged [and to which F]ather pled guilty[.] With respect to fostering a relationship, [the] same is not always feasible or in the best interest[s] of [C]hild. While [M]other may be well[-]intentioned, she is not capable of caring for [C]hild given his special needs and[, what is] of the u[t]most importance to the [c]ourt in cases like this[,] is permanency for [C]hild. [C]hild has the opportunity to have [a] permanent home in which he has the ability to thrive. [C]hild suffers from autism and needs consistency and stability in his life.

N.T. Permanency/Goal Change Hearing, 12/20/23, at 61.

The court determined that, based on the circumstances of this case—namely, that Father is indefinitely incarcerated and Mother admits she is unable to care for her special needs Child and has expressed multiple times that she would like foster parents to adopt Child—a delay in goal change would serve no practical purpose. We agree.

Although the agency has the burden to show a goal change would serve the child's best interests, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations" under [s]ection 6351. *In re D.P.*, [] 972 A.2d 1221, 1227 (Pa. Super. 2009)[] (emphasis in original); *In re S.B.*, [] 943 A.2d 973, 978 [(Pa. Super. 2008)][.] "[T]he parent's rights are secondary" in a goal change proceeding. *In re D.P.*, *supra*.

- 9 -

> Because the focus is on the child's best interests, a goal change to adoption might be appropriate [] even when a parent substantially complies with a reunification plan. ***In re N.C.***, ***supra*** at 826-27.
>
> Where a parent's "skills, including her judgment with regard to the emotional wellbeing of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. ***Id.*** at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. ***In re A.L.D.***, [] 797 A.2d 326, 340 (Pa. Super. 2002). ***See also In re S.B.***, ***supra*** at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); ***In re A.P.***, [] 728 A.2d 375, 379 (Pa. Super. 1999) [] (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, [] 901 A.2d 502, 513 (Pa. Super. 2006).

***In re R.M.G.***, 997 A.2d 339, 347 (Pa. Super. 2010).

While in county jail awaiting sentencing, Father participated in a Nurturing Parenting program and successfully completed a parenting program in Pike County. However, due to the unavailability of the Nurturing Parenting program in state prisons, Father was unable to continue with that program when he was transferred to SCI Dallas in early December 2023. JWP Director Fondalledas testified that Father was "compliant with what [staff] asked him to do [in the parenting programs]." N.T. Permanency Review/Goal Change Hearing, at 32. Also, CYS caseworker Perry testified that, sometime before

Child was removed from Father's home, Father attempted to suffocate his girlfriend with a plastic bag. *Id.*

Mother completed a Nurturing Parenting program and participated, although sporadically, in weekly scheduled supervised visits at JWP. CYS Caseworker Perry testified that the agency had no reason to believe that there would be any harm to Child if Mother were permitted to remain active in Child's life following a goal change. *Id.* at 20, 23. However, Justice Works Program (JWP) Director Theresa Fondalledas testified that Mother "struggled with [Child's] negative behaviors [at visits], struggled with understanding basic age[-]appropriate expectations [for Child], . . . and most of the time she just let him do what he wanted to do instead of . . . trying to get him to do what she was requesting or what was necessary." *Id.* at 31. Program Director Fondalledas also testified that, at her first visit, Mother told Fondalledas that she wanted foster mother to adopt Child. *Id.* at 30-31, 33-34, *see also id.* at 53 (Mother testifying she has concerns about her ability to take care of Child and is worried she may not be able to meet his needs). Child has positively progressed behaviorally, socially, and cognitively since his placement with foster parents, and now recognizes the alphabet and being able to work on an iPad to communicate. *Id.* at 23-24.

Despite the efforts that Father and Mother have made, based on the record as a whole, we conclude that it is in Child's best interest to change the goal to adoption. *In re N.C.*, *supra*. Neither parent has made progress

toward alleviating the circumstances that led to Child's placement, Father's release date from prison remains uncertain at best, Mother has recognized she is incapable of caring for her extremely vulnerable special-needs child, and, based on Father's past abusive behavior and lack of progress in his goals, the court properly concluded that Father is not able to provide a safe and nurturing environment for Child. *See In re R.J.S.*, *supra*; *In re S.B.*, *supra*. *See also* 42 Pa.C.S.A. § 6351(f) (at each permanency review hearing, court determines, among other things: continuing necessity for and appropriateness of placement; extent of compliance with family service plan; extent of progress made towards alleviating circumstances necessitating original placement; appropriateness and feasibility of current placement goal for child; likely date placement goal for child might be achieved; whether reasonable efforts made to finalize permanency plan in effect; and child's safety).

Father's and Mother's lack of, or minimal compliance with, plan goals does not support reunification in the foreseeable future. *In re N.C.*, *supra*. Moreover, Child's special needs require stability and permanency—two things that foster parents are able to give him as an adoptive resource. *See In re S.B.*, *supra*; *see also* 42 Pa.C.S.A. § 6351(f.1(2)) (based upon additional determinations under subsection (f.1), "the court shall order the continuation, modification[,] or termination of placement or other disposition which is best suited to the safety, protection[,] and physical, mental[,] and moral welfare

of the child"). Because the trial court's findings are supported by competent evidence of record, we find no abuse of discretion in the court's decision to change the permanency goal to adoption. ***In the Interest of S.G.***, ***supra***.

Finally, Father asserts that the trial court improperly denied his request for visitation where the court failed to identify what grave threat of harm to Child exists if Father were to have supervised visitation in state prison and where there was a lack of testimony that Father posed a present or future safety risk to Child. ***See*** Fathers' Brief, at 10-11.

The standard against which visitation between parents and their dependent children is measured depends upon the goal mandated in the family service plan. ***See In re C.J.***, 729 A.2d 89, 95 (Pa. Super. 1999). Where reunification remains the goal, our Court has stated that parental visitation with the child may not be denied or reduced unless it poses a grave threat to the child. ***See id.*** The "grave threat" standard is met

> when the evidence clearly shows that a parent is unfit to associate with his or her children; the parent can then be denied the right to see them. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

***See In the Interest of C.B.***, 861 A.2d 287, 294 (Pa. Super. 2004) (citation omitted).[11]

_____

[11] Where the goal, however, is no longer reunification, the court may suspend, limit, or deny visitation if it is in the best interests of the child. ***In re C.J.***, 729 A.2d at 95 ("The 'best interests' standard, in this context, is less

*(Footnote Continued Next Page)*

Father complains that the court erred in failing to "reconsider" the issue of visitation at the goal change hearing where "contact visits could [now] be accommodated at the state correctional facility . . . unlike the contactless visits which were the only option when [he] was incarcerated at the [c]ounty [jail]." Father's Brief, at 9.

Although Father contends he has "taken accountability for his actions[,] been cooperative with" CYS, and has completed or participated in parenting classes made available to him while incarcerated, the trial court found that "[Father's] severe moral deficiencies pose a grave threat of serious emotional and psychological harm to [Child]." Trial Court Opinion, at 6, 8. We agree with this finding; the evidence clearly supports a finding that Father is unfit to associate with Child.

The abusive actions inflicted by Father on his special needs child were so abhorrent that they, in and of themselves, demonstrated his moral depravity which constitutes a grave threat to Child. *See C.B.*, *supra* at 294 (visitation properly denied based on violent sexual nature of father's conduct

_____

protective of parents' visitation rights than the 'grave threat' standard."). We recognize that although the concurrent goal of reunification and adoption existed at the August 2, 2023 permanency review hearing, the court applied a best interests of the child standard when determining whether Father should be granted visitation with Child. Although this was a legal error, *In re C.J.*, *supra*, we conclude that the error was harmless where the court applied the proper standard—grave threat—when considering visitation at the final goal change/permanency hearing in December 2023—the order from which Father currently appeals.

toward child; evidence of sexual abuse so heinous and repugnant so as to conclude father possessed moral deficiency constituting grave threat to child); **_Green v. Sneeringer_**, 635 A.3d 1074 (Pa. Super. 1993) (where father committed first-degree murder of child's mother, murder conviction alone constituted sufficient evidence to determine father possessed moral deficiency constituting grave threat to child and deny visitation). Accordingly, we cannot conclude that the trial court exercised its judgment in a manifestly unreasonable way when it denied Father's request for visitation with Child. **_In re S.B._**, **_supra_**.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/30/2024