J-S19017-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.S.-Q.S.-L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 184 WDA 2021 |

Appeal from the Order Entered January 6, 2021
In the Court of Common Pleas of Beaver County Juvenile Division at
No(s): CP-04-DP-0000014-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: M.D.V.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 185 WDA 2021 |

Appeal from the Order Entered January 6, 2021
In the Court of Common Pleas of Beaver County Juvenile Division at
No(s): CP-04-DP-0000013-2020,
FID -04-FN0000-28-2008

BEFORE:   DUBOW, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY MURRAY, J.:                   **FILED: JULY 16, 2021**

D.L. (Mother) appeals from the orders changing the placement goals

from reunification to adoption with respect to her two sons, P.S.-Q.S.-L., born

---

[*] Retired Senior Judge assigned to the Superior Court.

in February of 2020, and M.D.V.M., born in June of 2016 (the Children).[1] Upon review, we affirm.

Mother has a history of substance abuse which precipitated the involvement of Beaver County Children and Youth Services (CYS). N.T., 1/5/21, at 46. Sue Willy, the CYS caseworker, testified that Mother has eight children, many of whom were born prematurely and drug-addicted. *Id.* at 38, 46. None of Mother's children resided with her at the time of the underlying proceeding. *Id.* at 46.

The Children's dependency cases originated after P.S.-Q.S.-L. was born with cocaine and marijuana in his system. Trial Court Opinion, 3/8/21, at 1. On March 16, 2020, the trial court placed the Children in emergency protective custody of CYS; P.S.-Q.S.-L. was four weeks old, and M.D.V.M. was three years old. On March 18, 2020, following a hearing, the court placed the Children in shelter care. The court adjudicated the Children dependent on April 14, 2020.[2]

The Children's permanency goal was initially reunification. Mother was assigned the following family service plan (FSP) objectives: participate in drug treatment and random drug screens; participate in mental health treatment;

---

[1] Q.S., the father of P.S.-Q.S.-L., is deceased. J.B., the father of M.D.V.M., did not participate in the proceeding and did not appeal the goal change order.

[2] The trial court noted that Mother appealed the dependency adjudications, which this Court affirmed. Trial Court Opinion, 3/8/21, at 2.

attend supervised visits with the Children; and obtain stable housing. Trial Court Opinion, 3/8/21, at 2; N.T., 1/5/21, at 37-40, 42.

Following a permanency review hearing, the court issued a permanency order on August 4, 2020 finding Mother failed to comply with her objectives. Specifically, the court found Mother had not made herself available to CYS or to mental health and drug treatment providers. Trial Court Opinion, 3/8/21, at 2-3; Permanency Review Order, 8/4/20, at 1.

The next permanency review hearing occurred on January 5, 2021,[3] when CYS requested a change in the Children's permanency goal to adoption.[4,5] CYS presented testimony from the caseworker, Sue Willy, and the Children's foster mother, Z.S. Mother testified and presented testimony from her fiancé, A.C. At the conclusion of the hearing, the trial court stated its findings of fact and conclusions of law on the record. N.T., 1/5/21, at 130-144.

By orders entered January 6, 2021, the trial court changed the Children's goals to adoption. The court found Mother minimally complied with

---

[3] The hearing occurred via WebEx due to court protocols involving Covid-19.

[4] The hearing included Mother's older daughter, B.L.-T., who is the Children's half-sister. The court granted CYS's on-the-record request that B.L.-T. remain in the permanent, legal, and physical custody of her maternal grandmother; the court also terminated protective supervision and closed B.L.-T.'s case. N.T., 1/5/21, at 13, 19-20.

[5] The Children were represented by a guardian *ad litem* (GAL) who has filed an appellee brief in support of the goal change.

the permanency plan, and made no progress in alleviating the circumstances necessitating the Children's placement. Permanency Review Order, 1/6/21, at 1. The court concluded the placement goal of reunification "is NOT appropriate and/or NOT feasible." *Id.* at 2.

Mother filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated at the request of CYS. The trial court filed its Rule 1925(a) opinion on March 8, 2021.

Mother raises three issues for review:

1. Whether the [t]rial [c]ourt erred and abused its discretion when [it] changed the permanency goal to adoption from reunification when Mother was non-compliant but had elevated [*sic*] the original conditions that necessitated the original placement[?]

2. Whether the [t]rial [c]ourt erred and abused its discretion when [it] determined that the current goal of reunification was not appropriate and not feasible[?]

3. Whether the [t]rial [c]ourt erred and abused its discretion when [it] determined that Mother was minimally compliant with the permanency plan[?]

Mother's Brief at 5-6.

We review the orders mindful of the following:

In cases involving a court's order changing the placement goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a

- 4 -

responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted).

Nonetheless, "[w]hen the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result." *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006).

We have explained:

Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S. §§ 6301-6365], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

*Id.* (citations and footnotes omitted) (emphasis in original).

Section 6351(f) of the Juvenile Act sets forth the considerations for the trial court as follows:

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the

- 5 -

child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . .

(F.1) ADDITIONAL DETERMINATION.-- Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

. . .

42 Pa.C.S.A. § 6351(f)(1)-(6); 42 Pa.C.S. § 6351(F.1)(1)-(2).

We emphasize that the best interests of the child, not the parent, must guide the trial court. *In re S.B.*, 943 A.2d at 978. Further, there is no minimum period of time that a child's goal must be set at reunification before it may be changed. *In re M.S.*, 980 A.2d 612 (Pa. Super. 2009). This Court

- 6 -

has held "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.*, 909 A.2d at 824 (quoting *In re Adoption of M.E.P.,* 825 A.2d 1266, 1276 (Pa. Super. 2003)).

Instantly, the trial court found "Mother has completely turned her back on the Children. Mother has visited with the Children on only two occasions in the past nine (9) months. . . ." Trial Court Opinion, 3/8/21, at 19. The court further found that Mother refuses to submit to random drug screens, has not maintained drug treatment, and is unwilling to cooperate with CYS. *Id.* at 20-21. The court concluded, "Mother's blatant unwillingness to cooperate with [CYS] makes it impossible for [CYS] to move towards a goal of reunification, as Mother refuses to make any attempts to achieve the goals of the [p]ermanency [p]lan. . . ." *Id.* at 21.

Turning to Mother's argument, we note Mother disregards procedural rules by failing to divide the argument section of her brief into separate parts. Likewise, Mother does not display particular points in the argument section of her brief. *See* Pa.R.A.P. 2119 (providing "[t]he argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part -- in distinctive type or in type of distinctively displayed -- the particular point treated therein, followed by such discussion and citation of the parties as are deemed pertinent"). Pa.R.A.P. 2101 underscores the seriousness with which this Court views our rules, and provides for quashal or

dismissal of an appeal for noncompliance. Nonetheless, we consider Mother's substantive argument. The crux of Mother's argument is that the court should not have changed the Children's placement goals because Mother "made significant strides" in alleviating the circumstances necessitating the Children's placement. Mother's Brief at 12. Mother argues:

> While Mother was non-compliant with the [FSP], Mother made significant strides to [alleviate] the conditions that originally necessitated the . . . [C]hildren's placement. Mother had successfully completed a [drug] relapse prevention program through Dr. Joshua Curry, and by doing so created a supportive relationship with him. Mother obtained stable, safe, and appropriate housing. . . . Mother had been involved in mental health treatment through Primary Health Network. Additionally, Mother has maintained a healthy relationship with a stable significant other, which provided her with an unbreakable support system.
>
> Non-compliance alone cannot dictate a goal change when a parent has made significant strides in eliminating the conditions that originated the placement. . . .

Mother's Brief at 12-13. Mother cites our decision *In re T.M.W.*, 232 A.3d 937 (Pa. Super. 2020) for the proposition that she "should be able to utilize resources to achieve compliance even if they are not the resources specifically utilized by [CYS]." Mother's Brief at 15. Mother's argument is unavailing.

With regard to her drug abuse issues, Mother introduced into evidence a certificate of completion for a relapse prevention program dated June 23, 2020. N.T., 1/5/21, at 103-104. Mother received the certificate from Joshua John Curry by e-mail. *Id.* at 103. Mother testified she enrolled in the program

voluntarily, and the court admitted the certificate as Exhibit 3.[6] **_Id._** at 102-105.

Ms. Willy confirmed that Exhibit 3 indicated Mother completed a twelve-hour course in relapse prevention, but stated the program did not satisfy CYS's concerns regarding Mother's drug use. **_Id._** at 40.[7] She also testified that Mother is not currently receiving drug treatment. **_Id._** at 39. Mother confirmed she had not received drug treatment since June of 2020. **_Id._** at 116.

Ms. Willy additionally expressed concern that Mother was currently using drugs. **_Id._** at 41. She explained Mother acknowledged using marijuana, but did not provide evidence of medical authorization such as a marijuana card. **_Id._**; **_see also id._** at 116-117 (Mother testifying she uses marijuana). Ms. Willy testified that Mother refused her requests for a drug screen on November 6 and 16, 2020. **_Id._** at 40-41. In addition, Mother was pregnant, and on December 29, 2020, refused blood work and a urine screen at her prenatal appointment. **_Id._** at 38, 41. As such, and contrary to Mother's assertions, there is no support for her claim that she made "significant strides" in overcoming her drug abuse issues.

With respect to Mother's mental health objective, the court found Mother "is addressing her mental health needs, although even this is inconsistent as

---

[6] Exhibit 3 is not in the record.

[7] Ms. Willy further testified that Joshua Curry testified during the adjudication hearing, and the trial court found him not credible. N.T., 1/5/21, at 40.

she has missed appointments." Trial Court Opinion, 3/8/21, at 21. Ms. Willy testified that Mother receives treatment at Primary Health Network. *Id.* at 38. However, Ms. Willy noted Mother missed appointments on September 30, 2020, October 29, 2020, and December 2, 2020. *Id.* at 39. In addition, she stated Mother "is not compliant with [taking] her mental health medication, and [her therapist] also recommended [she participate in] behavior therapy, and I believe [Mother is] not interested in doing that." *Id.*

Finally, Ms. Willy testified Mother is on probation for an unspecified criminal conviction. *Id.* at 45. Ms. Willy believed Mother was not compliant with her probation requirements, which involved mental health but not drug testing, and communicating at regular intervals with her probation officer. *Id.* at 45. Ms. Willy explained, "The last I had contact with [Mother's probation officer,] I believe was the beginning of December [of 2020], and he had not heard from [Mother] since September." *Id.* Again, this evidence refutes Mother's claim she made "significant strides" in addressing her mental health.

Regarding Mother's housing objective, Ms. Willy testified "there has been a history of [Mother] having trouble maintaining housing." *Id.* at 44. She explained Mother "has lost her housing on numerous occasions, probably at least four. . . . And, honestly, I see it as a result of her not following through with mental health or drug and alcohol over the years that she mentally has been unable to sustain independent housing." *Id.* at 49. Ms. Willy stated that to her knowledge, Mother's longest period of housing stability was on one

occasion for "possibly six months." *Id.* Ms. Willy testified that in December of 2020, Mother moved into an apartment with her fiancé, A.C. *Id.* at 42. Mother testified to having a six-month lease in both her and A.C.'s names. *Id.* at 96. Ms. Willy assessed the apartment on December 29, 2020, and found it appropriate. *Id.* With respect to rent, Ms. Willy explained that A.C. is on parole, "and there is a program through [which] they will pay six months of his rent. . . ." *Id.* She testified, "I know that . . . [A.C.] needs to provide identification in order for them to pay for the six months. . . . I did make some copies for [A.C.] to try to assist him with . . . what he needs to do." *Id.* at 42-43.

Based on the foregoing, we discern no abuse of discretion by the trial court in concluding Mother's housing situation is not stable. The court reasoned, "the first six months of her current housing arrangement are paid for through [a] program available to [s]tate parolees. There is no indication that Mother will have the ability to remain in this housing after the six months paid housing is exhausted." Trial Court Opinion, 3/8/21, at 20.

In sum, the record contradicts Mother's assertion that she "made significant strides" in alleviating the drug, mental health, and housing issues which led to the Children's placement.

Further, Mother's reliance on *T.M.W.* is misplaced. In *T.M.W.*, this Court vacated a goal change where evidence demonstrated "the trial court did not consider whether [the m]other had substantially complied with the [FSP]

goals." **T.M.W.**, 232 A.3d at 949. We found "[the m]other was making progress toward reunification and/or it was uncertain whether reunification would be futile and/or contrary to [the c]hild's best interest." **Id.** Further, we noted "the court held [the m]other to a specific requirement . . . at her therapy session when she had never been ordered to do so." **Id.** We specifically concluded the child welfare agency did not make reasonable efforts to return the child to the mother because the caseworkers "failed to inform [the m]other for more than four months that her chosen psychologist . . . was not appropriately treating her for delusional disorder as per the [FSP]." **Id.** at 947.

In contrast, the evidence in this case demonstrates Mother has not complied with the FSP objectives for reunification. The court stated on the record that CYS "has made reasonable efforts. M[s.] Willy . . . is like chasing her tail in this case. She's not ever going to catch it. . . ." N.T., 1/5/21, at 141. To the extent Mother contends her completion of the twelve-hour relapse prevention program was sufficient to satisfy the drug treatment objective, we disagree. Unlike **T.M.W.**, there is no evidence Ms. Willy led Mother to believe that her completion of the relapse prevention program would satisfy her drug treatment goal. Further, Mother acknowledged to Ms. Willy and the court that she continues to use marijuana, without indicating she has medical authorization to do so. Also, Mother refused Ms. Willy's requests for drug screens, and refused blood work and a urine screen at her prenatal

appointment on December 29, 2020. N.T., 1/5/21, at 38. Thus, **T.M.W.** is not applicable.

In addition to Mother's failure to progress in her drug, mental health, and housing objectives, she failed to comply with supervised visitation with the Children as part of her permanency plan. CYS scheduled weekly supervised visits. N.T., 1/5/21, at 29. Ms. Willy testified Mother did not attend the visits. **Id.** Mother claims the court "failed to [consider] the ramifications these visits posed to Mother's mental and physical health." Mother's Brief at 18. Mother asserts:

> Mother was immensely concerned that she could do something stupid from the pain of having to leave the [C]hildren post-visitation. Mother had indicated on multiple occasions to the [c]aseworker that this was her reasoning to not attend visits. The caseworker's only response was that Mother essentially had to suffer through. This shows [CYS] had little respect for Mother's mental health, nor the extent that a mental breakdown could have on the [C]hildren if it occurred in their presence.

**Id.** at 12.

Ms. Willy addressed Mother's argument on cross-examination by the GAL:

> Q. With regard to the [C]hildren, what is [Mother]'s basis for [not visiting]?
>
> A. I worked with [Mother] for many years, and from what she tells me she says . . . you know my bond is with [M.D.V.M.]. I can't sit there having a supervised visit and then leave him. I don't want to, she doesn't want to, do something stupid.
>
> And I told her, although I . . . can understand where she's coming from, to kind of suck it up. . . .

- 13 -

I told her . . . put your feelings aside, and do what is in the best interest for [the Children] and that's [for them] to maintain a relationship with you.

I said, "I understand that you don't feel comfortable having to sit there in . . . the supervised visit, but it's just kind of where things are at, and you just have to sometimes do things in life that you're not comfortable with."

*Id.* at 50-51.

Pertinently, the Children are in the same foster home with foster mother, Z.S., who testified the Children had resided with her for six months. *Id.* at 78. Z.S. stated Mother saw the Children on two occasions — in June of 2020, for M.D.V.M.'s birthday, and on December 26, 2020.[8] *Id.* Z.S. stated Mother never asks how the Children are doing medically or otherwise.[9] *Id.* at 83. Z.S. also testified M.D.V.M has never asked to see or contact Mother. *Id.* at 80-81.

Mother testified she would like P.S.-Q.S.-L. to live with his grandmother, however, she indicated otherwise to Ms. Willy.[10] *Id.* at 116.

_____

[8] The record is unclear as to where the December visit occurred, and whether Mother visited with both Children at that time. N.T., 1/5/21, at 78-79.

[9] P.S.-Q.S.-L. has asthma which requires Z.S. to give him albuterol and breathing treatments. N.T., 1/5/21, at 86. *Id.* Z.S. testified doctors "want to put him on a five-day steroid." *Id.* at 87.

[10] Ms. Willy testified on direct:

Q. Has [M]other repeatedly over the last couple of weeks indicated to you a desire that [P.S.-Q.S.-L.] remain permanently with [Z.S.]?

On this record, we discern no abuse of discretion by the trial court.  The

court reasoned:

> Neither the Foster Parent [n]or [CYS] did anything to stop [M]other from having contact with the [C]hildren. . . .  Mother's claimed justification for failing to maintain contact with the [C]hildren was that it was hard to leave the [C]hildren after visiting with them.  The record contains no credible evidence that corroborates this contention.  The court specifically finds that the [C]hildren are not adversely affected by the cessation of any visits

---

> A.  Yes, she has.
>
> Q. And did you encourage her to speak to her attorney about this?
>
> A. I have.
>
> Q. And as you heard from [Mother's counsel,] being that she has indicated that . . . [Mother] would prefer a guardianship as opposed to an adoption, is that accurate?
>
> A.  That's accurate.
>
> Q. And given the child's young age and the fact that he has been almost entirely in the care of [Z.S.] and certainly never in the care of Mother since his date of birth, as well as the hierarchy of permanency established in Pennsylvania, what is the desired permanency goal that the agency would be seeking for [P.S.-Q.S.-L.] today?
>
> A.  Adoption.
>
> Q.  And the secondary goal would be permanent legal guardianship; is that correct?
>
> A.  That is correct.

N.T., 1/5/21, at 34.

- 15 -

[by Mother]. The court specifically finds [M]other endures no physical or mental ill affects [*sic*] after visits with the [C]hildren. Mother and [M.D.V.M.] have a knowledge of each other. That familiarity with Mother by [M.D.V.M.] does not arise out of the traditional mother-child bond but rather as a reflection of time the child spent with Mother prior to the inception of this case. During the time [M.D.V.M.] is with the foster parent, he does not ask for his mother, he does not talk about his mother, and he shows no adverse consequences from Mother's action in terminating her relationship with the child by not having anything but the absolute minimum contact with [him].

Order, 1/6/21, at 1-2.

The court noted Mother's testimony that "she does not intend to cooperate with [CYS], and has not cooperated with [CYS] pre-dating the December/January alleged incident where she indicated she lost trust in the current caseworker and [CYS]." Trial Court Opinion, 3/8/21, at 8. Specifically, Mother testified during the following exchange:

Q. You indicated that your issues with [Ms. Willy] are the reason that you are no longer willing to work with [CYS]. That incident that you are referring to occurred in January, or in December; is that correct?[11]

A. Yes.

. . .

Q. You were also not working with [CYS] prior to that incident occurring?

A. Yes. . . .

N.T., 1/5/21, at 117.

_____

[11] Mother did not describe an incident with Ms. Willy, but generally alleged Ms. Willy "has done nothing but violate my laws of privacy, and she betrayed my trust. . . ." N.T., 1/5/21, at 108.

Ms. Willy described her relationship with Mother prior to P.S.-Q.S.-L.'s birth as "fairly good." *Id.* at 62. She explained, "However, once [P.S.-Q.S.-L.] was born with cocaine in his system, and the case . . . took a turn in a different direction, I think she's really struggled with . . . this is what has to happen for you to get your children back. I think it's been a real struggle for her." *Id.*

Given the above testimony, the court did not abuse its discretion in concluding it is impossible for CYS to move toward reunification because Mother refuses to cooperate. *See* Trial Court Opinion, 3/8/21, at 21.

For all of the above reasons, Mother's claims lack merit. The trial court did not err in the changing the Children's permanency goals.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/16/2021

- 17 -