J-A07041-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Q.-C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: F.H.-P., MOTHER | : | No. 1447 EDA 2021 |

Appeal from the Order Entered June 2, 2021
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000190-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: Q.-I.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: F.H.-P., MOTHER | : | No. 1448 EDA 2021 |

Appeal from the Order Entered June 2, 2021
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000191-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: Q.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: F.H.-P., MOTHER | : | No. 1449 EDA 2021 |

Appeal from the Order Entered June 2, 2021
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000192-2021

IN THE INTEREST OF: Q.P., A   :   IN THE SUPERIOR COURT OF
MINOR              :   PENNSYLVANIA
                           :
                           :
                           :
                           :
                           :
                           :
APPEAL OF: F.H.-P., MOTHER   :     No. 1450 EDA 2021

Appeal from the Order Entered June 2, 2021
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000193-2021

BEFORE: DUBOW, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED MAY 31, 2022**

Appellant, F.H.-P. ("Mother"), appeals from the orders entered in the Philadelphia County Court of Common Pleas, which adjudicated her minor children, Q.-C.P, Q.-I.P., Q.E.P., and Q.P. ("Children") dependent. We affirm.

The trial court set forth the relevant facts and procedural history of this case as follows:

> The Philadelphia Department of Human Services ("DHS") first became aware of this family on December 7, 2020 when it received a General Protective Services ("GPS") report alleging that Children were physically abused by Mother. Specifically, the report alleged that Mother hit Children with brooms, metal poles, and sticks. The report also alleged that [Q.E.P.] was suicidal and had stated her intent to kill herself. The report was determined to be valid. [Q.E.P.] was subsequently hospitalized due to her suicidal ideations and Carson Valley Community Services were implemented in the home.
>
> On February 19, 2021, DHS received a second GPS report alleging that [Q.E.P.] was experiencing suicidal ideations and planned to kill herself. The report also alleged that Children stated that Mother hit them and locked them in the

basement. This report was validated. On February 25, 2021, DHS received a third GPS report alleging that [Q.E.P.] had overdosed on Tylenol. The report further alleged that [Q.E.P.]'s overdose had been reported to the principal of Children's school who called the police and that the Philadelphia Fire Department [("PFD")] had to break down the door of the home because Mother had been refusing to open the door for two hours. After the police, [Emergency Medical Services ("EMS")], and PFD finally gained entry, [Q.E.P.] was taken to Einstein Crisis Response Center and then transferred to Children's Hospital of Philadelphia. Following this incident, DHS obtained an [order of protective custody ("OPC")] for Children and removed them from Mother's care to ensure their well-being. A Shelter Care Hearing was held on February 26, 2021, whereby the OPC was lifted and the court ordered that the temporary commitment to DHS stand.

The relevant Adjudicatory Hearing was held before [the trial court] on June 2, 2021. The DHS supervisor, Daniel McVay, testified that the first GPS report in December 2020 included allegations that Mother was waking Children up at 4 A.M. by hitting them with [objects] including switches and extension cords and then forcing them to clean the home before school. He also testified that the report alleged that Mother locked [Children] in the basement when they misbehaved. Mr. McVay further testified that during the investigation of the December 2020 GPS report, [Q.E.P.] was hospitalized for suicidal ideations and that following her hospitalization, Mother refused to cooperate with the in-home services offered to her and therefore [Q.E.P.] never received any aftercare services. Mr. McVay also testified that two more GPS reports were received alleging inappropriate discipline and mental health concerns regarding [Q.E.P.]. All three GPS reports were moved into evidence without objection.

Mr. McVay testified that on February 25, 2021, DHS received a notification that [Q.E.P.] was suicidal and had ingested pills and that the Philadelphia Police Department responded but were unable to gain access to the home. He testified that DHS went to the home where they met the police who still had not been able to gain entry to the home. He stated that the Fire department had to be called to break down the door. Mr. McVay testified that once in the home, Mother

was argumentative and refused to cooperate even as [EMS] took [Q.E.P.] to the hospital. He further testified that he interviewed each of the children following this incident. Children disclosed that they lived in fear, that they were hit with extension cords or switches when they did things wrong, and that they were locked in the basement if they misbehaved. Children also expressed their fear that they would face repercussions for speaking with any of the workers. Mr. McVay also testified that Mother confirmed that she has hit Children with her hand as well as with an extension cord. He further testified that Mother had told [Q.E.P] that her depression was not real. Additionally, he testified that after [Q.E.P.] was placed at Belmont Hospital, the hospital attempted outreach to Mother in order to involve her in case planning and aftercare services but that Mother never responded.

Following Mr. McVay's testimony, DHS called Michael Micco, Assistant Principal of Commonwealth Charter Academy, to testify. Mr. Micco testified that Q.-I.P. had communicated with him through the chat feature of the learning management system on February 25, 2021. He stated that in the morning of the 25th, Q.-I.P. had told him that Mother had thrown one of the Children on the bed and hurt her the previous day. He further stated that two hours later. Q.-I.P. again used the chat feature to tell her teacher that [Q.E.P.] had taken pills and was trying to commit suicide. Mr. Micco testified that once the police arrived, Q.-I.P. disclosed that Mother had told Children "not to make a sound."

The Community Umbrella Agency ("CUA") Case Manager, Jamie Baxter, testified that she had spoken to each of the children separately and that they all reported essentially the same allegations against Mother. Children told her that they were locked in the basement and that [Q.E.P.] stated she had once been locked in the basement for the entire day without food. She also testified that Children stated that they were hit every morning when woken up with items such as cords and ropes. Ms. Baxter also testified that at the beginning of the agency's involvement, none of the children wanted any contact with Mother because they felt unsafe. She further testified that more recently, Q.P. and Q.-C.P. have been attending visits regularly and have expressed some interest in going home but that [Q.E.P.] and Q.-I.P.

> have stated that they do not feel safe and do not ever want to return to Mother's care.
>
> Following the testimony of Mr. McVay, Mr. Micco, and Ms. Baxter, Mother took the stand and denied all of the allegations presented against her. She testified that she spanks Children but does not use any objects other than her hand to do so. She also testified that she does wake Children up before school to do chores but not always at 4 A.M. as alleged. She also testified that she does not lock Children in the basement. She further testified that she did not know that [Q.E.P.] had swallowed pills or that "any of those things would have gone on." She also denied that she refused to answer the door for the police and did not know that the police were there.

(Trial Court Opinion, filed October 14, 2021, at 1-5).

After considering the evidence presented, the trial court adjudicated Children dependent on June 2, 2021, and ordered them to remain as committed and as placed. On July 2, 2021, Mother timely filed separate notices of appeal and contemporaneous concise statements[1] for each underlying docket number concerning each child. This Court consolidated the appeals *sua sponte*.

Mother raises the following issues for our review:

Whether the trial court erred as a matter of law by allowing

_____

[1] Mother filed her notices of appeal and concise statements *pro se*, even though she was still represented by counsel, in contravention of the rule against hybrid representation. **See Commonwealth v. Williams**, 151 A.3d 621 (Pa.Super. 2016) (explaining general rule that hybrid representation is not permitted in this Commonwealth; thus, this Court will not accept *pro se* filings while appellant is still represented by counsel; nevertheless, filing of *pro se* notice of appeal while represented by counsel is distinguishable from other filings because notice of appeal protects constitutional right). Trial counsel subsequently filed amended concise statements on Mother's behalf.

- 5 -

the admission of and relying on inadmissible evidence.

Whether the trial court erred as a matter of law or abused its discretion in finding that the [DHS] met its burden to prove, by clear and convincing evidence, that [Children] were dependent children.

Whether the trial court erred as a matter of law or abused its discretion in finding that [DHS] met its burden to prove that it was clearly necessary to remove [Children] from [Mother]'s care.

Whether the trial court erred as a matter of law in making the pre-placement finding required by 23 Pa.C.S.A. § 6351 (b)(2) of the Pennsylvania Juvenile Act, by determining that [DHS] made reasonable efforts to prevent or eliminate the need for the removal of [Children] from [Mother]'s care.

(Mother's Brief at 4) (re-ordered for purposes of disposition).

In her first issue, Mother argues the trial court erred by allowing the admission of hearsay testimony. Mother maintains that Children were present and could have testified at the adjudicatory hearing. Mother avers the court erred by permitting DHS witnesses to testify about prior statements made by Children. Mother concludes that "the statements from Mr. McVay regarding what [Children] said should be disregarded as well as all other witnesses' testimony regarding what [Children] told them." We disagree.

Preliminarily, Mother failed to object at any point during the adjudicatory hearing to any testimony by DHS witnesses concerning prior statements made by Children. Mother's counsel also stated that she had no objections when the GPS reports containing prior statements from Children were offered into evidence. (*See* N.T. Hearing, 6/2/2021, at 20). Further, Mother's brief is

- 6 -

completely devoid of any citation to authority or meaningful argument on why any such evidence was inadmissible pursuant to the Pennsylvania Rules of Evidence. For these reasons, Mother has waived her first issue. *See Coulter v. Ramsden*, 94 A.3d 1080, 1089 (Pa.Super. 2014), *appeal denied*, 631 Pa. 719, 110 A.3d 998 (2014) (stating: "[O]nly claims properly presented in the [trial] court are preserved for appeal"); *In re Estate of Whitley*, 50 A.3d 203, 209 (Pa.Super. 2012), *appeal denied*, 620 Pa. 724, 69 A.3d 603 (2013) (reiterating: "This Court will not consider the merits of an argument which fails to cite relevant case or statutory authority"); Pa.R.A.P. 302(a) (stating: issues not raised in trial court cannot be raised for first time on appeal).

In her second, third and fourth issues combined, Mother avers that DHS failed to produce clear and convincing evidence to establish that Children lacked parental care and control, and that such care and control was not immediately available to them. Mother argues the court erroneously concluded that Mother inappropriately disciplined Children based on inadmissible hearsay evidence. Mother also contends she was unaware that Q.E.P. ingested any pills and therefore, the court erred in finding that Mother failed to provide mental health treatment for Q.E.P. Mother asserts that "[C]hildren's basic needs were being met [such as] food, clothing, shelter and … an education. As such, [Children] should not have been adjudicated dependent." (Mother's Brief at 15).

Mother further argues that even if Children were properly adjudicated

dependent, there was no evidence in the record to support removing Children from Mother's care. Mother insists the court erred by failing to consider whether there were feasible alternative dispositions which would allow Children to remain with Mother. Mother also claims there was insufficient evidence in the record to support the court's determination that DHS made efforts to prevent or eliminate the need for the removal of Children from Mother's care. Mother concludes the trial court erred in adjudicating Children dependent, or in the alternative, erred in removing Children from Mother's care. We disagree.

The applicable scope and standard of review for dependency cases is as follows:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013) (quoting *In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)).

> We accord great weight to this function of the hearing judge because [the court] is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before [the court]. Relying upon [the court's] unique posture, we will not overrule [its] findings if they are supported by competent evidence.

*In re A.H.*, 763 A.2d 873, 875 (Pa.Super. 2000). *See also In re R.J.T., supra* (explaining that appellate court is not in position to make "close calls"

- 8 -

based on fact-specific determinations; trial judges are ones to observe parties during hearing and usually have presided over several other hearings with same parties and have longitudinal understanding of case and best interests of individual child involved; thus, even if appellate court would have made different conclusion based on cold record, we are not in position to reweigh evidence and credibility determinations of trial court).

The Juvenile Act defines a dependent child, in pertinent part, as follows:

**§ 6302.  Definitions**

\*     \*     \*

**"Dependent child."**  A child who:

(1)   is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his [or her] physical, mental, or emotional health, or morals.  A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302.

A court may adjudicate a child as dependent if the child meets the statutory definition of a dependent child by clear and convincing evidence. **In re E.B.**, 898 A.2d 1108, 1112 (Pa.Super. 2006).  Additionally, "[a] finding of dependency can be made based on prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." **In re R.W.J.**, 826 A.2d 10, 14 (Pa.Super. 2003).  "The court

must make a comprehensive inquiry into whether proper parental care is immediately available or what type of care [the parent] could provide in the future." *Id.*

> If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state.

*In re E.B., supra* at 1112.

Upon a finding of dependency, the court must focus on the child's best interests and order a disposition best suited to the child's safety and well-being. *In re S.B.*, 943 A.2d 973 (Pa.Super. 2008), *appeal denied*, 598 Pa. 782, 959 A.2d 320 (2008); *In re L.C., II*, 900 A.2d 378, 381 (Pa.Super. 2006). The court may not separate the child from the parent unless it finds that the separation is clearly necessary. *In re G.T.*, 845 A.2d 870 (Pa.Super. 2004). Such necessity is implicated where the child's welfare, safety, or health demands he or she be taken from his or her parent's custody. *Id.*; *In re R.W.J., supra*.

Instantly, the court adjudicated Children dependent based on Mother's inability to provide for Children's mental and physical well-being. Specifically, the court determined that Mother did not take necessary action to address Q.E.P.'s mental health concerns, noting:

> The December 7, 2020 GPS report alleging inappropriate discipline and [Q.E.P.]'s mental health concerns was determined to be valid. Mr. McVay testified that during the investigation of this report, [Q.E.P.] was hospitalized for suicidal ideations and Mother refused to cooperate with the in-home services provided to her, resulting in [Q.E.P.] being deprived of necessary aftercare services for her mental health. Moreover, the February 19, 2021 GPS report alleging similar mental health concerns as well as inappropriate discipline was also validated. Mr. McVay also credibly testified as to the circumstances surrounding the February 25, 2021 GPS report whereby [Q.E.P.] attempted to commit suicide by overdosing on Tylenol and Mother refused to grant the EMS, police, or DHS access to her home, resulting in the fire department having to break down the door.
>
> [The court] is extremely concerned that after two prior GPS reports and investigations regarding [Q.E.P.]'s mental health, as well as [Q.E.P.]'s former hospitalization, Mother not only took no action to address these concerns or provide for the health and well-being of her child, but she intentionally prevented emergency services from accessing her child and providing medical care following [Q.E.P.]'s suicide attempt.

(Trial Court Opinion at 7-8). Further, the court credited testimony from DHS witnesses and validated GPS reports indicating that Mother inappropriately disciplined Children by regularly hitting them with various objects such as extension cords and locking them in the basement.[2]

Our review of the record supports the court's findings. *See In re A.B.*, *supra*; *In re A.H., supra.* Based on the evidence demonstrating

---

[2] Although Mother maintains the trial court erroneously admitted evidence referencing Children's prior statements, we have already decided that Mother waived her admissibility challenge. Thus, we will consider all evidence in the record before us.

inappropriate discipline and lack of mental health care, we find no error in the court's conclusion that Children were presently without proper parental care and such care was not immediately available. ***See*** 42 Pa.C.S.A. § 6302. Therefore, the court did not err in adjudicating Children dependent.

The court further concluded that keeping Children in Mother's care would be contrary to their welfare, safety and health. The evidence demonstrates that Mother inappropriately disciplined Children such that all of the children reported being afraid of Mother and feeling unsafe in her care. Mother has also repeatedly demonstrated an unwillingness to provide proper medical care for Q.E.P.'s serious mental health concerns by refusing in-home aftercare services and denying access to EMS after Q.E.P.'s attempted suicide. Based on the ongoing safety concerns, we agree with the trial court that Mother was unable and unwilling to meet Children's basic health and safety concerns, such that removal was clearly necessary. ***See In re G.T., supra***.

Further, the court determined that DHS made reasonable efforts to prevent Children from being removed from Mother's care. DHS did not seek placement for Children until after multiple GPS reports had been validated concerning Mother's inappropriate discipline, and multiple instances of Mother's uncooperative and obstructive behavior regarding mental health care for Q.E.P. The record supports the court's findings. ***See In re A.B., supra***. Accordingly, we affirm the orders adjudicating Children dependent.

Orders affirmed.

Judge McLaughlin joins this memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/31/2022