J-A04017-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.S., GRANDMOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1375 MDA 2025 |

Appeal from the Order Entered August 29, 2025
In the Court of Common Pleas of Centre County Juvenile Division at
No(s): CP-14-DP-0000027-2023

BEFORE: PANELLA, P.J.E., KING, J., and LANE, J.

MEMORANDUM BY KING, J.:                    **FILED FEBRUARY 20, 2026**

Appellant, S.S. ("Grandmother"), appeals from the order entered in the Centre County Court of Common Pleas, which changed the permanency goal to adoption concerning minor child, K.D.K. ("Child") (born in May 2011). We affirm.

The relevant facts and procedural history of this case are as follows. On August 15, 2023, Centre County Children and Youth Services ("CYS") filed an application for emergency protective custody of Child. Therein, CYS stated that it received a referral which alleged that Grandmother (Child's maternal grandmother) was in the process of being arrested at her home. At that time, Grandmother was the primary caretaker and legal guardian of Child, since November 2012. The source of the referral stated that several family members had been contacted but none were able to care for Child, who was present in the home at the time of Grandmother's arrest. CYS responded to

the home, at which time parole officers who were present informed CYS that they had reached out to Grandmother's estranged husband, an "Uncle Dave," an "Uncle Craig," and a person identified as "Moon"; none were able to care for Child. CYS made other attempts to contact family and friends but were unsuccessful in finding a placement for Child. Notably, Child had little to no contact with his biological parents since Grandmother had gained custody of him in November 2012. Thus, CYS stated that reasonable efforts were made to prevent the placement of Child and there were no less restrictions. The court granted the application for emergency protective custody that day.

On August 18, 2023, the court issued a shelter care order finding sufficient evidence that the return of Child to Grandmother was not possible due to Grandmother's incarceration. The order indicated that a dependency petition would be forthcoming. The court ordered Child to remain in foster care and ordered CYS to continue to engage in family finding until further order of court.

On August 21, 2023, CYS filed a dependency petition alleging that Child was without proper care or control. On August 30, 2023, following a hearing, the court adjudicated Child as dependent. Thereafter, the court held permanency review hearings on January 24, 2024, May 7, 2024, November 1, 2024, and April 11, 2025.[1]

On August 29, 2025, the court held a hearing regarding the termination

---

[1] The transcripts from these proceedings are not in the certified record.

of the parental rights to Child's biological parents. Grandmother was present at the hearing via Zoom from the State Correctional Institution where she was housed. Although Child's mother voluntarily relinquished her parental rights and had signed a consent for adoption, Grandmother opposed termination of Child's mother's parental rights. Grandmother claimed she had *in loco parentis* standing in the termination proceeding such that she could oppose termination of Child's mother's parental rights, relying on **Interest of K.N.L.**, ___ Pa. ___, 284 A.3d 121 (2022).[2] The court declined to make an express ruling on the standing issue at that time but agreed to hear Grandmother's testimony in the event that standing was proper.

Grandmother testified that she is Child's biological maternal grandmother and obtained custody of Child when he was 6½ months old. Child's mother's whereabouts were unknown at that time; Grandmother also had custody of Child's sibling at that time.[3] Grandmother stated that Child has always called her "mom," "momma" or "mommy."

_____

[2] In **Interest of K.N.L.**, the Supreme Court addressed a former caregiver's asserted *in loco parentis* status for purposes of standing to intervene in an adoption proceeding. The Court held that "[a]n individual's previously-held *in loco parentis* status may, in a particular circumstance … allow the party to be heard with regard to the substance of an adoption matter wherein the paramount consideration is the child's best interest. In such a case, the individual asserting *in loco parentis* status must demonstrate a legitimately-acquired assumption of the parental role, and a discharge of parental duties." **Id.** at ___, 284 at 150.

[3] At the time of the termination hearing, Grandmother's estranged husband had custody of Child's sibling. However, he was unable to provide care for Child.

Grandmother acknowledged that she was incarcerated in August 2023. Grandmother stated that she tried to maintain contact with Child while incarcerated. Grandmother had weekly video conferences when she was in the county jail. Grandmother also visited with Child when incarcerated in the State Correctional Institution. During Grandmother's incarceration, Grandmother's husband left Pennsylvania with Child's sibling and moved to Oklahoma. Grandmother expressed frustration with two missed visits with Child; one video visit where Grandmother claimed she sat for a half hour, but Child was not present, and another in-person visit around Child's birthday that was missed due to a paperwork issue. Grandmother admitted that she had not seen Child since March 2025 in person, or on video since April 2025. After the missed visit around Child's birthday in May 2025, Child wrote Grandmother a letter indicating that he did not wish to visit with her anymore. Nevertheless, Grandmother continued to write to him. Grandmother expressed concerns that Child's letter was prompted by things the foster family was telling him.

On cross-examination, Grandmother stated that she was serving a sentence of 24 to 48 months' imprisonment. Grandmother expressed hope for parole soon and to be reunited with Child upon her release from prison. Grandmother stated that she could be released as early as November 13, 2025 but admitted her release at that date was not guaranteed.

At the conclusion of Grandmother's testimony, the court heard argument from the parties. The court then took a recess so that the court and parties could review the standing issue. Following the recess, the court

decided that Grandmother could not object to Child's mother's consent to adoption and the termination of mother's parental rights; but suggested that Grandmother might have standing to intervene in any adoption proceedings.

The court then continued the hearing regarding termination of the parental rights of Child's biological father. The court heard testimony from CYS placement caseworker, Harley Chambers. Ms. Chambers stated that CYS attempted to contact Child's father numerous times to no avail. Ms. Chambers indicated that Child's father never had a relationship with him. Ms. Chambers confirmed there would be no detriment to Child by terminating his father's parental rights. By contrast, Ms. Chambers testified there is a strong bond between Child and his foster parents.

Child's guardian *ad litem* ("GAL") also stated that Child wants to be adopted by his foster parents and wishes for permanency. The GAL indicated that Child has an established bond with his foster parents.

At the conclusion of the hearing, the court stated that it would terminate the parental rights of Child's father. The court also stated that it would sign the final consent order and decree regarding Child's mother's consent to adoption; and the court would change the goal to adoption. The court entered orders to that effect that day. The court indicated that another permanency review hearing would take place on September 8, 2025, at which point the court would speak to Child.[4]

---

[4] In its Rule 1925(a) opinion, the court indicates that it also interviewed Child off the record prior to the August 29, 2025 hearing.

Grandmother timely filed a notice of appeal and concise statement of errors complained of on appeal per Pa.R.A.P. 1925(a)(2)(i) on Monday, September 29, 2025, challenging the court's goal change order.

Grandmother raises the following issues for our review:[5]

> Did the trial court abuse its discretion and err as a matter of law in concluding—absent clear and convincing evidence—that reunification was neither appropriate nor feasible, and in ordering a goal change to adoption without adequately considering the maternal grandparent's involvement in the child's life?
>
> Did the trial court err in changing the permanency goal to adoption, specifically … in finding that Children and Youth Services gave due consideration to kinship resources for the child to prevent dependency in violation of applicable family finding requirements?
>
> Whether the trial court properly applied the statutory framework of 42 Pa.C.S. § 6351(f)(9) when changing the child's permanency goal to adoption, including consideration of statutory exceptions to filing a petition to terminate parental rights?

---

[5] We note that the standing dispute that took place at the termination hearing concerned whether Grandmother had standing to oppose Child's mother's consent to adoption; the parties did not expressly dispute whether Grandmother had standing to challenge changing the permanency goal to adoption. Notably, neither CYS nor Child's GAL challenge Grandmother's standing in this appeal to challenge the goal change order. Thus, we deem any challenge to Grandmother's standing for purposes of this appeal waived. **See Interest of K.N.L., supra** at ___, 284 A.3d at 150 n.22 (nothing that although standing is threshold determination, challenges to standing may be waived if not promptly raised).

(Grandmother's Brief at 17).[6]

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.*, 909 A.2d 818, 822 (Pa.Super. 2006).

> In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will," as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witness and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

*Id.* at 822–23 (internal citations omitted).

In her remaining issues combined, Grandmother argues that the court failed to consider her significant and longstanding relationship with Child. Grandmother asserts that she had legal custody of Child since November 2012, and she provided him with stability and care for approximately 11 years prior to her incarceration in August 2023. Grandmother contends that the

_____

[6] We observe that Grandmother did not raise her third issue on appeal in her Rule 1925(a)(2)(i) statement. (*See* Rule 1925(a)(2)(i) Statement, filed 9/29/25, at 1-2). As Grandmother raised only her first two issues on appeal in her concise statement, the court only analyzed those two issues in its Rule 1925(a) opinion. (*See* Trial Court Opinion, 10/28/25, at unnumbered pp. 1-4). Under these circumstances, Grandmother's third issue on appeal is waived and we decline to address it. *See In re M.Z.T.M.W.*, 163 A.3d 462 (Pa.Super. 2017) (holding that mother's failure to include issue in Rule 1925 concise statement waived issue on appeal).

court should have given substantial weight to this established bond and history of caregiving. Grandmother avers that the court failed to consider the temporary nature of her incarceration versus the permanency of changing Child's goal to adoption. Grandmother claims the court placed undue weight on two failed visitation attempts in May 2025. Grandmother emphasizes that the first missed in-person visit was prevented by a prison policy change requiring Child's birth certificate—a circumstance beyond Grandmother's control; the second failed visitation attempt occurred due to possible misconnection on a Zoom call, in which Grandmother was logged into, but could not participate in, the call. Grandmother insists that the court should have considered whether CYS made reasonable efforts to facilitate successful visitation before concluding that these failed attempts justified a goal change.

Grandmother also complains the court placed too much emphasis on its off-the-record interview with Child. Grandmother submits that the court did not analyze properly whether Child's current feelings might be temporary or influenced by his recent placement experiences. Grandmother further argues that the court did not consider whether therapeutic intervention might help repair any strain in the relationship between Grandmother and Child. Grandmother asserts that the court did not adequately explore whether services could be provided to strengthen Grandmother's relationship with Child before making the drastic decision of changing Child's goal to adoption. Grandmother proclaims that this failure constitutes an abuse of discretion.

Grandmother also maintains that CYS did not demonstrate that it fulfilled its obligation to explore family findings efforts. Grandmother insists that the court's dismissal of Grandmother as a placement option solely based on her incarceration ignored whether Grandmother might have been able to identify other family members who could care for Child temporarily until her release from incarceration. Grandmother contends the court gave insufficient weight to the importance of preserving family connections and exploring all potential kinship resources before changing the permanency goal to adoption. Grandmother concludes the court abused its discretion in changing Child's permanency goal to adoption, and this Court must grant relief. We disagree.

The Juvenile Act controls the disposition of dependent children. *See In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Section 6351 provides in relevant part:

**§ 6351. Disposition of dependent child**

\* \* \*

**(f) Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original

placement.

(4)    The appropriateness and feasibility of the current placement goal for the child.

(5)    The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)    Whether the child is safe.

\*    \*    \*

(9)    If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i)        the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii)        the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii)        the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

(10)    If a sibling of a child has been removed from his home and is in a different placement setting than the child, whether reasonable efforts have been made to

place the child and the sibling of the child together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

(11) If the child has a sibling, whether visitation of the child with that sibling is occurring no less than twice a month, unless a finding is made that visitation is contrary to the safety or well-being of the child or sibling.

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

> (i) the caregiver is following the reasonable and prudent parent standard; and

> (ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

* * *

**(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's

parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3)  If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4)  If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

\*    \*    \*

**(f.2) Evidence**.—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g)   Court order**.—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f), (f.1), (f.2), (g).

This Court has stated:

Although the agency has the burden to show a goal change would serve the child's best interests, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations" under Section 6351. ***In re D.P.***, 972 A.2d 1221, 1227 (Pa.Super. 2009),

- 12 -

*appeal denied,* 601 Pa. 702, 973 A.2d 1007 (2009) (emphasis in original); ***In re S.B.***, [943 A.2d 973, 978 (Pa.Super. 2008)], *appeal denied,* 598 Pa. 782, 959 A.2d 320 (2008).  "[T]he parent's rights are secondary" in a goal change proceeding.  ***In re D.P., supra.***

Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan.  ***In re N.C., supra*** at 826–27.  Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan.  ***Id.*** at 825.  The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. … ***See also In re S.B., supra*** at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); ***In re A.P.***, 728 A.2d 375, 379 (Pa.Super. 1999), *appeal denied,* 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent").  Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa.Super. 2006).

***In re R.M.G.***, 997 A.2d 339, 347 (Pa.Super. 2010), *appeal denied*, 608 Pa. 648, 12 A.3d 372 (2010) (some internal citations omitted).

Instantly, the court analyzed Grandmother's claims on appeal as follows:

[Grandmother] is the maternal grandmother of the subject Child.  At the August 29, 2025 permanency hearing in this matter, [CYS] established through clear and convincing evidence that the statutory requirements of 42 Pa.C.S. § 6351(f)(9) had been met.  As such, by Orders dated August

- 13 -

29, 2025 and September 9, 2025,[7] this [c]ourt changed the subject Child's permanency placement goal from "return home" to "adoption." The subject Child's concurrent placement goal is placement with a legal custodian (relative). The parental rights of the Child's mother and father were also terminated following the August 29, 2025 hearing; the Child's mother consented to the termination by signing a written consent to adopt dated July 7, 2025, the Child's father's parental rights were terminated involuntarily as CYS has had no contact since the Child was taken into CYS custody.

The [c]ourt maintains that its Orders dated August 29, 2025 and September 9, 2025 were correctly decided; specifically, the [c]ourt maintains that CYS established by clear and convincing evidence that the statutory requirements of 42 Pa.C.S. § 6351(f)(9) had been met, including that the exceptions described in [Section] 6351(f)(9)(i), (ii), and (iii) were not applicable.[8]

[Grandmother] is currently incarcerated at SCI Muncy for a minimum two-year sentence after having pled *nolo contendere* to forgery-related charges on or about March 12, 2024. [Grandmother] was arrested on or about August 15, 2023, resulting in the Child—who was in the physical custody of [Grandmother] at the time—being taken into CYS custody. The Child has been "in placement" in accordance with 42 Pa.C.S. § 6351(f)(9) for 26 months, most of which has been spent in a non-kinship, agency-approved foster home in Julian, PA. The [c]ourt understands that the Child

---

[7] The record indicates that the court issued another permanency review order on September 8, 2025, stating that the placement goal continued to be adoption and setting a proposed adoption date for Child. Grandmother's instant appeal arises only from the August 29, 2025 order.

[8] We reiterate that Grandmother's third issue on appeal claimed that the court did not properly decide whether the exceptions described in Section 6351(f)(9) were applicable. Although the court commented on this finding above, it did not elaborate on its analysis, presumably because Grandmother did not raise that issue in her concise statement. *See* footnote 6, *supra*. As we have already decided that Grandmother's third issue on appeal is waived, we decline to address it further. *See id.*

- 14 -

attempted to visit [Grandmother] on two (2) occasions during the review period, one in person and one by video conference, but that neither visit occurred.[2]  Regardless of the circumstances of the visits, since that time the Child has stopped reading the letters sent by [Grandmother], has stopped sending letters to [Grandmother], and no longer wishes to participate in [Z]oom or in-person visits with [Grandmother].   The [c]ourt held an off-the-record interview with the Child immediately prior to the August 29, 2025 permanency hearing, from which the [c]ourt determined that reasonable efforts to prevent or eliminate the need to remove the Child from [Grandmother's] care need not continue to be made.  Specifically, the Child clearly expressed to this [c]ourt in the off-the-record interview that he does not wish to be placed with [Grandmother], that he is disappointed in [Grandmother's] conduct resulting in his placement, and that he is thriving with his foster family.  Based on the interview, as well as the other testimony and evidence received at the August 29, 2025 hearing, this [c]ourt found that the statutory requirements of 42 Pa.C.S. § 6351(f)(9) had been met and changed the Child's permanency goal to "adoption."

[2] The [c]ourt understands that the first visit, on May 10, 2025, was thwarted by a change to SCI Muncy visitation policy requiring the Child's birth certificate. The second visit was scheduled for May 26, 2025 by Zoom, and the [c]ourt understands that the Child was logged on and ready to participate, whereas [Grandmother] logged in but did not participate in the call and could be heard speaking to another inmate throughout.

*    *    *

… Throughout the proceedings, CYS has engaged in the required family finding pursuant to Pa.R.J.C.P. 1149.  The Child's parents had their parental rights terminated on August 29, 2025; the Child's ex-step grandfather ([Grandmother's] ex-husband) moved to Oklahoma in December 2024 without providing his address and without saying goodbye to the Child; and [Grandmother], the last remaining kinship possibility, is incarcerated.  Accordingly, this [c]ourt properly determined that it was in the best

- 15 -

interest of the Child to change his permanency goal from "return home" to "adoption."

(Trial Court Opinion at unnumbered pp. 1-4).

Our review of the record confirms that competent evidence supported the court's findings. *See In re N.C., supra*. Additionally, the court's above statements make clear that it did not place undue weight on the facts of Grandmother's incarceration or the missed visits. Further, the record supports the court's statements that CYS attempted to make appropriate family finding for Child, but those efforts were unsuccessful. Grandmother did not provide for CYS, and does not identify on appeal, any other kinship resource who would have been able and willing to care for Child during Grandmother's incarceration. The court understood the history of the case and Grandmother's significant relationship with Child prior to her incarceration. Ultimately, however, the court could not subordinate Child's present need for permanence and stability to Grandmother's hope to remedy her circumstances in the future. *See In re R.M.G., supra*. On this record, we cannot say that the court abused its discretion in changing Child's permanency goal to adoption. *See In re N.C., supra*. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 02/20/2026